## MORPUL, INC. v. MAYO KNITTING MILL, INC.

(Filed 27 August, 1965.)

**1. Patents § 1—**

While only a Federal Court has jurisdiction of an action involving the construction of the patent laws, a State court has jurisdiction of an action to enforce the payment of royalties or license fees.

**2. Patents § 2—**

If the means or method used by the licensee of the patent would infringe the patent but for the license, such licensee is liable for the royalties specified in the licensing agreement.

**3. Appeal and Error § 49—**

Where the referee's findings, approved by the judge, are supported by the evidence, the only question presented on appeal is whether the facts found support the legal conclusions of the court below.

**4. Patents § 2—**

Where there is no essential conflict in the evidence and the case presents only whether the method or means used by the licensee was an application

of prior art or was covered by the patent, the licensee's liability for royalties may be determined as a question of law.

**5. Pleadings § 28—**

Plaintiff may recover only upon the case made out in his pleading.

**6. Patents § 2—**

Under the doctrine of equivalents, a person may not avoid liability for the use of a patent by merely varying the details of the patented method or by merely reversing the motion of the parts of a machine to accomplish the same purpose, but if the desired result is achieved by another and a non-equivalent method, no liability arises.

**7. Same—**

A patent must be construed with reference to the distinctive features of the prior art, and the prior art may diminish the extent of the patent, since the patent cannot be held to include the prior art.

**8. Same—**

Plaintiff's method for elongating the stitch in knitting the cuff of socks was by the patented method of modifying the machine by inserting an auxiliary stitch cam or other means or apparatus to lower the needles of the machine. Defendant obtained the same result of enlongating the stitch, without any modification of the machine, solely by adjusting the machine so as to raise the cylinder in the conventional way under the prior art. *Held:* The patent was not upon the product, and defendant was not liable for royalties under his license.

**9. Costs § 3—**

In a reference, the judge has discretion to apportion the costs. G.S. 6-21(6).

**10. Reference § 8—**

Where order affirming the report of the referee is treated by the parties as a judgment, the Supreme Court may do so in order to dispose of the appeal, but nevertheless the cause must be remanded for judgment in accordance with the report of the referee as amended by the court.

APPEAL by plaintiff from *McLaughlin, J.,* January 4, 1965 Civil Session of GUILFORD (Greensboro Division).

This appeal involves two actions in contract by an assignee-licensor against its licensee for royalties for the use of a patent.

Plaintiff is a North Carolina corporation engaged in the business of licensing certain patents and trademarks to the hosiery industry. Defendant is a North Carolina corporation engaged in the manufacture and sale of hosiery. On May 1, 1955, plaintiff and defendant entered into a written agreement whereby plaintiff gave to defendant a non-exclusive license to use U. S. Patents No. 2,420,771; 2,466,885; 2,473,-677, which it owned, as well as for the use of its trademark "Morpul." Defendant agreed, *inter alia:* (1) to pay plaintiff, on or before the

10th day of each month, 5¢ per dozen pairs of hosiery manufactured under the foregoing patents or bearing the legends: "This is MORPUL, the Action Cuff, Reg. U. S. Pat. Off." and "Pat. 2420771 and other Patents (M-100)" (these legends were to be placed on all hosiery manufactured *or* sold under plaintiff's letters patent); (2) to comply with specified standards of quality and construction, which standards were applicable to all licensees of the patents, failure of licensee to comply with these standards, within 30 days after notice, terminating its license; (3) to submit to plaintiff for approval "each new construction of hosiery" before offering it for sale; and (4) to use its best efforts "to promote the use and develop the inventions and the trademark" and to report to licensor any infringement by unlicensed persons.

In addition to the patents listed in the contract of May 1, 1955, plaintiff acquired on or about October 23, 1959, U. S. Pat. No. 2,716,876 (the Surratt patent) and immediately notified defendant by letter that it was privileged to use the Surratt patent upon the terms of the license of May 1, 1955.

Plaintiff's first action was instituted on May 1, 1961, in the Greensboro Municipal County Court. The complaint alleges merely that defendant is obligated by contract to pay plaintiff royalties upon the sale of hosiery covered by plaintiff's patents and that, upon sales and shipments made prior to and including May 31, 1960, defendant owes plaintiff $2,962.50. Defendant admitted a contract to pay plaintiff royalties upon the sale and shipment of hosiery covered by its patent, but denied that it owed plaintiff any sum under the contract. The judge of the Municipal County Court rendered judgment on November 20, 1961, in favor of plaintiff for the amount prayed, and defendant appealed to the Superior Court.

On May 7, 1963, plaintiff filed an action against defendant in the Superior Court for royalties allegedly due for sales during the period June 1, 1960 — March 31, 1963. In its second action plaintiff alleges:

Defendant has employed the Surratt patent in the manufacture of styles 825, 826, 530, and 840 and has, from time to time, used plaintiff's trademark "Morpul" on style 565. Use of the Surratt patent consisted of employing an auxiliary stitch cam on defendant's machines, "except that auxiliary stitch cams have been omitted on some machines," and the same results obtained "by elevating the needle cylinder relative to the sinkers." Defendant's methods of knitting the styles of socks in question "consisted of the sequences of knitting steps recited in plaintiff's Surratt patent." As a result of this use of the Surratt patent, for the period May 31, 1960 — March 31, 1963, under the terms of the 1955 contract between them, defendant owes plaintiff $21,645.17, with interest.

Answering, defendant admitted its obligation to pay plaintiff the royalties specified in the contract for all hosiery manufactured and delivered under the patent license. It denied, however, that it had ever actually "infringed" or used the Surratt patent in the manufacture of style numbers 825, 840, 530, and 565, but admitted that in 1959, when it first began to produce these styles, it marked them with transfers which had been ordered in conformity with the contract of May 1, 1955; that when it realized these styles "were being marked with the identification symbol number 'M-100,' this was discontinued" and the styles were thereafter marked with "Ezy-Doz-It" transfers. Defendant averred that since May 31, 1960, it had not marked styles 530, 565, 825, and 840 with any legend, number, or symbol identified with plaintiff.

The Superior Court consolidated the two cases for trial and entered an order of compulsory reference naming Mr. J. A. Kleemeier, Jr., referee, who heard the evidence of both parties and thereafter made his findings of fact and conclusions of law. His findings of fact and his conclusions of law are hereinafter summarized:

Immediately after the receipt of plaintiff's letter of October 23, 1959, authorizing it to use the Surratt patent, defendant did use it in the manufacturing of sock styles 505 and 507. For this use it has paid and continues to pay the royalties specified in the licensing contract. The hosiery involved in this action is five styles of men's socks, defendant's numbers 565, 840, 825, 826, and 530. A declining market for styles 505 and 507 caused defendant to begin manufacturing the sock styles in controversy, for which latter styles it has paid plaintic no royalties. These socks have long, elastic, mock-rib cuffs containing stitches substantially longer than those in the plain-knit foot. In the knitting process elastic yarn is laid in front of alternate stitches. In making these socks defendant did not use the combed cotton yarn required for hosiery manufactured under plaintiff's patent and trademarks.

Prior to May 31, 1960, the period covered by the first suit, defendant manufactured and sold at least 42,902 dozen pairs of crew socks upon which it imprinted the trademark "Morpul," plaintiff's patent No. 2,420,771, or the identification symbol which plaintiff had given defendant or another of its licensees. As to these socks the referee concluded that, under the contract, defendant was liable to plaintiff for the specified royalties whether the hosiery contained any of the "licensed patented inventions" or not, and that defendant owed plaintiff the sum of $2,145.10, with interest on the varying amounts comprising that total from the specified dates. Plaintiff did not except to this finding and conclusion.

Since June 1, 1960, defendant has manufactured and shipped 431,-302.5 dozen pairs of sock styles 825, 826, 840, 530, and 565. None of

these were imprinted with any marking identified with plaintiff's patents, trademark, or license. (Defendant controverts plaintiff's contention that in the manufacture of these styles it employed the means or methods disclosed by the Surratt patent, and this is the one question raised by the pleadings.)

The letters issued to Julian H. Surratt for his patent begin: "This invention relates to circular knitting machines and, more especially, to an improved method and apparatus for producing elastic fabric such as hosiery." It states one of its objectives as being:

". . . to provide an improved method and apparatus, for making elastic fabric wherein an elastic strand is laid in in front of some of the needles or alternate needles and in back of the other needles and the inelastic or body yarn is fed to the needles by the conventional fingers at the throat plate. Immediately past the throat plate, the needles are lowered to a position substantially lower than the position to which they are normally lowered during the forming of normal stitches so that, although the stitches are then drawn over the body portions of the sinkers, very elongated loops are formed thus resulting in a fabric which can be stretched to a much greater extent than conventional fabrics where the elastic yarn is laid in and the needles are lowered only to their normal lowered position in a stitch-forming operation."

Another objective is to provide:

". . . an auxiliary stitch cam with pattern controlled means for moving the auxiliary stitch cam into and out of operative position below one of the conventional stitch cams. The auxiliary stitch cam, when in operative position, serves as an extension to the lower portion of the conventional stitch cam. Thus, during the knitting of elastic portions of a stocking or other tubular fabric, the auxiliary stitch cam moves the needles to an abnormally lowered position during the forming of the stitches to form very elongated loops with the body yarn as it is drawn over the body portions of the sinkers and, during plain knitting of inelastic portions of a stocking or other tubular fabric, the auxiliary stitch cam is withdrawn from operative position so the needles are lowered by the corresponding conventional stitch cam to the normal lowered position to draw stitches of normal length over the body portions of the sinkers."

"(T)he Surratt patent claims in issue, namely, Claims 7 and 9 through 14, expressed in terms of apparatus in Claim 7 and in terms of method in Claims 9 through 14, is the combination in the

operation of a circular knitting machine of knitting with body yarns, feeding an elastic strand to the body yarn in advance of knitting, and lowering the knitting machine needles to an abnormally low or substantially lower position or level as compared with the position or level to which they are lowered during ordinary knitting, to form elongated body yarn loops or stitches.

"The sole apparatus claim of the Surratt Patent in issue, Claim 7, recites this patented invention in terms of means for manipulating the knitting machine needles, sinkers and feed fingers, including means for lowering the needles to an abnormally low level as compared to the level to which they are normally lowered during ordinary knitting to produce very elongated loops with the elastic strand laid in front of alternate body yarn loops and in back of the others."

Although claim 7 makes no mention of the auxiliary stitch cam referred to in the statement of the patent's objectives, the evidence reveals that this is the only apparatus by which Surratt lowered the needle to acquire the elongated stitch.

"The method claims of the Surratt Patent in issue, Claims 9 through 14, define this patented invention in terms of method steps, including the step of lowering the needles to a substantially lower than normal level (Claims 9, 10, 13 and 14) or to an abnormally low level as compared to the position or level to which they are lowered during ordinary knitting (Claims 11 and 12) to draw relatively elongated loops or stitches of greater than normal length from the body yarn. In addition, some of these claims recite raising of the needles after feeding of the elastic strand to cause the needle latches to pass above the elastic strand, resulting in the elastic strand being laid in the body yarn loops, but the other method claims are not limited to laying in the elastic strand."

Defendant did not use the auxiliary stitch cam disclosed by the Surratt patent in the manufacturing of the sock styles here involved. These styles were manufactured:

". . . on circular knitting machines of the Scott and Williams B-5 type. Each of these styles had an elastic mock-rib top portion and a plain knit foot portion. In knitting the mock-rib top portion of each style the knitting machine was operated to feed an elastic strand and two ends of body yarn to the knitting machine needles with the elastic strand fed in advance of the body yarn feed and with the needles manipulated to lay the elastic strand in the body

yarn without forming stitches in the elastic strand. The body yarn was engaged in the hooks of the needles and drawn over the body portions of the sinkers to form stitches upon downward movement of the needles. The movement of the needles to draw the stitches was controlled by stationary stitch cams (and the body yarn stitches in knitting the top portion were formed slightly longer than in the foot portion) by raising the needle cylinder, which effected a raising of the sinkers supported on the cylinder to increase the distance between the position of the yarn on the sinkers and the hooks of the needles, causing the needles to draw loops or stitches of body yarn longer than those drawn during ordinary knitting. The needles did not shift with the cylinder (but were retained in their normal fixed vertical path by stationary cams). Shifting of the needle cylinder vertically was effected in a conventional manner, without any additional attachment, and as commonly performed on conventional Scott and Williams B-5 machines of the type disclosed in Scott United States Patent Number, 1,152,850, issued September 7, 1915, and on various other types of Scott and Williams circular knitting machines, such as types K, KN and others."

In brief summary, under the Surratt patent an elongated stitch is obtained by means of an auxiliary stitch cam, which causes the needles to be lowered to a level below that to which they are lowered during the knitting of stitches of normal length. The Mayo machines have no means of abnormally lowering the needles. The cams remain stationary, and the elongated stitches in the cuff portion of the socks in controversy are made by raising and lowering the cylinder of the B-5 knitting machines, a method employed in knitting machines since 1915. According to the evidence, this is done without any modification of the pins which raise the cylinder. The stitch length can be controlled within the limits of the machine, and the method described in Claim 7 of the Surratt patent ("and means for lowering the needles to abnormally low level") is not employed. The raising of the needle cylinder does not affect the position of the needles, which move in the same path on the same place regardless of the movement of the cylinder. Both the Mayo and the Surratt methods get the elongated stitch by increasing the distance between the needle hooks and the position of the body yarn on the sinkers, and the end result, or product, might be indistinguishable.

Upon the undisputed fact, the referee found, both in his findings of fact and in his conclusions of law, that none of the socks in controversy in the second suit were manufactured under the Surratt patent or under any other patent listed in the license agreement of May 1, 1955;

that the Surratt and the Mayo means and methods produced substantially the same results, but the Mayo method of raising the needle cylinder to obtain elongated stitches in the cuff of the socks was not an equivalent of any of the means or methods disclosed by the Surratt patent, nor was it a mere inversion or reversal of the motion of elements contained in the means or methods disclosed by the Surratt patent. He found, therefore, that plaintiff is entitled to recover nothing in the second action.

Plaintiff filed exceptions to the report and waived its reservation of jury trial. By consent, Judge McLaughlin heard the arguments upon the exceptions and considered the evidence and briefs of the parties. He adopted both the referee's findings of fact and his conclusions of law, with one exception. He modified the assessment of costs by directing that the costs of the reference be allocated ⅓ to defendant and ⅔ to plaintiff, the referee having allocated ½ the costs to each party.

From the judgment of the Superior Court affirming the referee's report, plaintiff appealed.

*David Rabin, McNeill Smith and Jack Floyd for plaintiff appellant.*
*McLendon, Brim, Holderness & Brooks by Thornton H. Brooks; Bridgers, Horton & Britt by H. Vinson Bridgers; and B. B. Olive for defendant appellee.*

SHARP, J. "Only a Federal Court has jurisdiction to consider an action involving the construction of the patent laws, the validity of a patent, or questions of infringements. (Citations.) * * * But not every case involving rights conferred by the patent laws is beyond the jurisdiction of state courts. When the action is brought on a contract, or in tort, with respect to the exercise of a patent right the state court has jurisdiction (citations); or to enforce the payment of royalties or license fees, 40 Am. Jur., 653." *Coleman v. Whisnant*, 225 N.C. 494, 499, 35 S.E. 2d 647, 651. See Annot., Jurisdiction of state court over actions involving patents, 167 A.L.R. 1114, 1123.

Infringement of a patent is an unauthorized use of it. Black's Law Dictionary 920 (4th Ed., 1957). Plaintiff here does not sue for infringement, as it had authorized defendant to use the patent in question; and defendant, being a licensee, is estopped to assert the invalidity of the patent. *Freeman v. Altvater*, 66 F. 2d 506 (8th Cir.). Plaintiff sues for the royalties which defendant agreed to pay *if* it made use of the patent. As the referee pointed out, however, whether the means or method used by a licensee would infringe the patent but for the license determines whether such means or method is covered by the license. Although defendant, as licensee, cannot use "the state of the art" to

destroy the patent, yet "the state of the art may be used to construe and narrow the claims of the patent, conceding their validity. The distinction may be a nice one but seems to be workable." *Freeman v. Altvater, supra* at 507.

The findings of fact of the referee, approved by the judge, are conclusive on appeal if there is any competent evidence to support them. *Murphy v. Smith,* 235 N.C. 455, 70 S.E. 2d 697. A careful examination of the record discovers that the referee's findings here are supported by such evidence and that, in essential part, the evidence is not in conflict. The only question, therefore, is whether the facts found support the legal conclusion that the Mayo method of producing the sock styles in question is covered by the Surratt patent.

> "In *United States v. Esnault-Pelterie,* 303 U.S. 26, 30, 58 S. Ct. 412, 414, 82 L. Ed. 625, the Supreme Court said: '* * * where, with all the evidence before the court, it appears that no substantial dispute of fact is presented, and that the case may be determined by a mere comparison of structures and extrinsic evidence is not needed for purposes of explanation, or evaluation of prior art, or to resolve questions of the applications of descriptions to subject-matter, the questions of invention and infringement may be determined as questions of law.' " *Sbicca-Del Mac v. Milius Shoe Co.,* 145 F. 2d 389, 396 (8th Cir.).

The other questions debated in the briefs, (1) whether defendant has estopped itself by its original use of plaintiff's trademark and patent number to deny liability for the royalties in suit, and (2) whether defendant has breached its contract to promote the trademark and the use of defendant's patents and thereby rendered itself liable for royalties, are not raised by the pleadings. "A plaintiff cannot make out a case which he has not alleged." *Calloway v. Wyatt,* 246 N.C. 129, 133, 97 S.E. 2d 881, 884.

One does not avoid liability for the use of the method of a patent by varying the details of the method or of its apparatus. *Lever Bros. Co. v. Procter & Gamble Mfg. Co.,* 139 F. 2d 633 (4th Cir.). Neither a reversal of the motion of parts of a machine to accomplish the same purpose, *Wachs v. Balsam,* 38 F. 2d 50 (2d Cir.); *Reece Button-Hole Ma. Co. v. Globe Button-Hole Ma. Co.,* 61 Fed. 958 (1st C.C.A.), nor a shifting from the horizontal to the vertical without change of function, *International Banding Mch. Co. v. American Bander Co.,* 9 F. 2d 606 (2d Cir.), will avoid infringement. Thus, if defendant has achieved the mock-ribbed, laid-in elastic cuff by a method equivalent to that of plaintiff, than it is liable; if it has achieved the same result by another, non-equivalent, method, it is not liable for the royalties in suit.

The Surratt patent is not on a product, but on a process which uses an apparatus. It does not purport to arrogate the result.

The doctrine of equivalents in the law of patents evolved to prevent the pirating of an invention by minor variations.

> "The essence of the doctrine is that one may not practice a fraud on a patent. * * * The wholesome realism of this doctrine is not always applied in favor of a patentee but is sometimes used against him. Thus, where a device is so far changed in principle from a patented article that it performs the same or a similar function in a substantially different way, but nevertheless falls within the literal words of the claim, the doctrine of equivalents may be used to defeat the patentee's action for infringement. *Westinghouse v. Boyden Power Brake Co.*, 170 U.S. 537, 568. In its early development, the doctrine was usually applied in cases involving devices where there was equivalence in mechanical components. * * * Today the doctrine is applied to mechanical or chemical equivalents in compositions or devices. * * * What constitutes equivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case. Equivalence, in the patent law, is not the prisoner of a formula and is not an absolute to be considered in a vacuum." *Graver Tank Co. v. Linde Air Prod. Co.*, 339 U.S. 605, 608, 94 L. Ed. 1097, 1102, 70 S. Ct. 854, 856.

The doctrine originated in *Winans v. Denmead*, 56 U.S. (15 How.) 330, 14 L. Ed. 717.

It appears from the face of the Surratt patent, as well as from the evidence, that it is not a pioneer patent, but merely an improvement on the prior art. The same product was obtainable by means of the prior art, indeed by means of older patents owned by plaintiff and included in the license agreement of May 1, 1955. Under these circumstances, the patent would, as a general rule, on an issue of infringement, be given a narrow construction. *Miller v. Eagle Manufacturing Co.*, 151 U.S. 186, 38 L. Ed. 121, 14 S. Ct. 310, but, as between licensor and licensee, the courts will give to the claims of the patent in suit as liberal an interpretation as can be justified. Nevertheless, a licensee is not estopped to show the limits of the licensed patent by evidence of the prior art or by any other relevant fact. *Freeman v. Altvater, supra.*

Although the evidence with reference to the language of the Morpul and the Mayo methods is not in dispute, the conclusions of the patent experts who interpreted them are in dispute. Mr. Paul Bell, whom the referee found "to be qualified as an expert in the area of patent claim interpretation," testified for plaintiff that "the Mayo method appears

to be the same as the Surratt method" in that it simply reversed two or more mechanical parts. In both methods the elongated stitch is obtained by increasing the distance between the needle hooks and the position of the body yarn on the sinkers. The application for Surratt's patent was prepared in the office of Mr. Bell, who was then "aware of the fact that circular knitting machines were capable and were on the market for producing longer stitches in various portions of the circular knit fabric." One of defendant's witnesses said that the Mayo method of raising the cylinder, the conventional way of lengthening the stitch, is "old in the art"; that the apparatus and method in the Surratt patent are conventional, except for the lowering of the needles *by means of* the auxiliary stitch cam. Mr. Dalbert U. Shefte, whom the parties stipulated to be "a patent attorney, qualified to interpret patents," testified for defendant that, in his opinion, the Mayo method does not come under the Surratt patent because it is limited "to an auxiliary stitch cam or other *means* for abnormally lowering the needles," and the Mayo machines do not use the auxiliary cam or any other means for lowering the needles. "The Surratt patent," he testified, "contains apparatus and method claims. It is not based upon obtaining an elongated stitch, but on abnormally lowering the needles."

Mr. Julian H. Surratt, the inventor to whom the patent was issued, testified that he brought forth his "invention" for the purpose of producing a sock of the type Morpul then had on the market, "but only doing it in a different way." At that time the Morpul method, under the Crawford patent, was to pass the body of the yarn over the nib, or high portion, of the sinker. When Mr. Surratt sold his patent to Morpul, he did not reserve a license to himself. Nevertheless, he is now manufacturing socks with mock-ribbed tops containing laid-in rubber. He said that the Mayo machines which manufactured the socks in controversy do not operate according to his patent. He explained: When the auxiliary cam of his patent is out of action, the distance between the platform of the sinker and the needle hook is the normal distance, which determines the length of the stitch in the foot portion of the sock, but "when the auxiliary cam is actuated the needle is lower relative to the top of the sinker and that distance is the determining factor." Although claim 7 of the Surratt patent does not specify the particular "means of lowering the needles to an abnormally low level as compared to the level to which they are normally lowered during ordinary knitting to produce very elongated loops with the elastic strand laid in front of alternate loops and in back of others," both the specifications in the patent and the evidence interpreting the patent establish it beyond a peradventure that no means other than the auxiliary stitch cam have ever been attempted in connection with the Surratt patent.

MORPUL, INC. *v.* KNITTING MILL.

The essence of the Surratt patent is the insertion of the auxiliary stitch cam (or some other, presumably possible but unidentified, "means") into the machine. Mr. Surratt said, "As far as I know, all that I used to draw the abnormally elongated stitch was the auxiliary stitch cam." The auxiliary stitch cam — or some other, similar apparatus which must be inserted into a circular knitting machine — is clearly what differentiates the Surratt patent from the prior art. The patent must be referred to the distinctive features of the prior art, even as against a licensor, and the patent will not be held to include the prior art. Had defendant used the auxiliary stitch cam or inserted any other means or apparatus into its Scott and Williams B-5 circular knitting machines, by which means or apparatus the needles were lowered to an abnormally low level to produce an elongated stitch, it would have used the patent. But this it has not done. It has not, therefore, "infringed." *Leader Plow Co. v. Bridgewater Plow Co.,* 237 Fed. 376 (4th C.C.A.). It has merely used standard machines, known to the industry for 50 years, and, without adding attachments of any kind, has attained the elongated stitch. Surely, under these circumstances, it ought to be able to use its machine to make any stitch of which the machine is capable, without incurring liability to the owner of a patent whose apparatus and method are not used. Obviously, the Scott and Williams B-5 machine, patented for 50 years, is capable, by means of adjustment, not modification, of doing what defendant is doing. "It is the use of the whole of that which a purchaser buys when the patentee sells to him a machine. . . ." 40 Am. Jur., Patents § 152 (1942). How could we say that defendant is using plaintiff's patent by using, in an unmodified way, a machine long since patented by another? Where, as in textiles, "the cross-lights of the prior art," *Wachs v. Balsam, supra* at 51, are many, a later patent cannot so easily diminish an earlier one. It is just the other way around. We concur with the referee and the judge below that, notwithstanding that it is plaintiff's licensee, defendant and has not used the Surratt patent, during the period of the second suit; and we affirm their conclusions of law.

The division of the costs of the reference was within the judge's discretion. G.S. 6-21(6). We note, however, that Judge McLaughlin, with the exception of the one item of cost, merely affirmed, *ipsis verbis,* the referee's report, without entering any judgment upon it. G.S. 1-194; G.S. 1-195. But the parties have treated his order as a judgment, and, to dispose of the appeal, so do we. The case is remanded to the Superior Court for judgment in accordance with the report as amended by Judge McLaughlin.

Remanded for judgment.