**CROWN MACHINE & TOOL CO.,**
**Plaintiff-Counter-Defendant,**

v.

**D & S INDUSTRIES, INC. (formerly Thompson Industries, Inc.), Defendant-Counter-Plaintiff.**

**Civ. No. 4942–PHX.**

United States District Court
D. Arizona.

May 23, 1967.

Edward A. Haight, Haight, Simmons & Hofeldt, Chicago, Ill., Philip E. von Ammon, Fennemore, Craig, Allen & Mc-Clennen, Phoenix, Ariz., Alfred H. Plyer, Jr., Parker & Carter, Chicago, Ill., for plaintiff.

Carl Hoppe, James F. Mitchell, Hoppe, Mitchell, Murtha & Anderson, San Francisco, Cal., Thomas E. Parrish, Snell & Wilmer, Phoenix, Ariz., Harris, Kiech, Russell & Kern, Los Angeles, Cal., for defendant.

## OPINION

KILKENNY, District Judge:

This is a suit by Crown Machine & Tool Co. (Crown), against Thompson Industries, Inc. (Thompson), whose corporate title is now D & S Industries, Inc., for an accounting of royalties alleged to be due from defendant under an assigned patent license agreement. Defendant counterclaimed, first for declaratory relief, and second for damages under the antitrust laws.[1] The litigation is centered around disposable drinking cups manufactured from expandable polystyrene beads, which, in turn, draws into focus the scope, utility and operating effect of certain patents owned by Crown. Expandable polystyrene beads became generally available in America in 1954. These beads are small plastic particles impregnated with an expanding agent. Upon heating within a closed mold the beads expand and fuse together in a solid light weight plastic article which has the shape of the mold.

Crown, in 1956, decided to manufacture this type of drinking cup, and by

1. 15 U.S.C. §§ 1 and 2.

December 12, 1957, was distributing the product which was produced by its molding machines. As a result of this experiment, Crown applied for and became the owner of United States Patent 3,162,705 (705), which describes a "Method for Making Plastic Containers" and United States Patent 2,951,260 (260), which contains a detailed analysis of a "Molding Mechanism and Heating Arrangement". The 705 Patent was granted December 22, 1964, as the result of an application made on October 30, 1956. The 260 Patent issued September 6, 1960, was originally applied for on October 1, 1957. Crown is also the owner of United States Patent 3,125,780 (780), which was granted March 24, 1964. That patent describes an "Apparatus and Method for Making Plastic Containers." To commercially exploit the process, Crown entered into negotiations with Champion Papers, Inc. (Champion) and, on July 7, 1958, granted to Champion an exclusive license, whereby the latter could use throughout the United States (with the exception of Texas, Oklahoma and Louisiana) the subject matter disclosed in a group of patent applications, which included the then pending applications for the 260 and 705 Patents. On September 5, 1958, Crown sold Champion the first of several cup molding machines of the type described in the 260 Patent, and Champion began production soon thereafter.

Thompson first entered the picture in late 1959, after observing one of Crown's cups in Phoenix. It became interested in the product and, after encouragement from the Koppers Company of Pittsburgh, a supplier of expandable polystyrene beads, developed a molding machine which would produce drinking cups.

Crown continued to produce and sell foam cups on its machines, for the three-state market exempted from Champion's license until April of 1960, at which time it sold its remaining cup business to Champion. Champion then began designing a new machine for molding cups from expandable polystyrene beads. The development of this "Champion machine" resulted in a patent application by Champion on February 1, 1963, which was honored on August 24, 1965, by the issuance of U. S. Patent 3,202,734 (734).

By late 1961, Thompson and Magi-Cup Corporation of California, with which it had merged, posed a serious competitive threat to Crown and Champion. On December 15, 1961, a Champion vice-president wrote Detweiler, President of Crown, expressing the former's concern about increasing competition.

On July 6, 1962, Crown wrote six concerns, including Thompson, identical letters referring to its 260 Patent, asserting possible infringement. In the ensuing exchange of correspondence between Crown and Thompson, Thompson denied infringement and Crown demanded an inspection of the Thompson machines.

Rather than abating, competition in the foam polystyrene cup industry increased after the warnings sent by Crown in July, and by the fall of 1962 Champion's dominant position in the industry had declined to the point where it had less than 50% of the total sales volume. Under the Crown-Champion license agreement, Crown had the responsibility to enforce the patent rights, and Champion became quite forceful in its demands that more suits be instituted. On October 22, 1962, a Champion officer wrote Crown's president demanding the commencement of an infringement suit against Thompson, among others.

In October of 1962, Crown's counsel received a detailed description of the Thompson molding machine, and in January of 1963 a Crown representative inspected one of the Thompson machines. Conferences between Crown and Thompson proved futile, as Thompson insisted its machines did not infringe on the former's patents.

On August 2, 1963, Champion sold Crown a portion of its polystyrene cup business, and at the same time these two concerns entered into a revised license agreement. By the terms of this agreement, Champion was given the non-ex-

clusive right to use Crown patent rights in the production of cups and containers from expandable plastic materials, and to make and use machines for their manufacture, for a royalty of 2% of the net sales of cups and containers. The royalty obligation, however, extended only to cups and containers covered by claims on any patent among the "Crown patent rights", and to those made on any machine or by any method covered by claims among the "Crown patent rights." Of particular importance to this suit is Section 10 of the agreement, which gave Champion the right to assign or transfer its non-exclusive license in connection with the disposal of its business related to the production of cups and containers from expandable plastics:

"CHAMPION and its subsidiaries shall also have the right to dispose of its business related to the manufacture, use, or sale of cups and containers from expandable plastics under the 'CROWN patent rights' and 'CHAMPION patent rights' including all or substantially all of the assets of such business, and in connection therewith CHAMPION shall have the right to assign or transfer this license, except that as to said assignee or transferee the license shall be non-transferable, provided that CHAMPION transfers to such party at least a substantial portion of its facilities for said manufacture."

Shortly after the above agreement was executed, Thompson became interested in acquiring a plant in the Eastern United States, and began negotiations with Shield-Ware, Inc., a Champion subsidiary with production facilities in New Jersey. Subsequently, Shield-Ware sold substantially all its assets related to the production of cups and containers from expandable plastics to Thompson on September 9th. In connection with this sale, Champion executed a formal assignment to Thompson of its rights under the above section.

After Thompson had operated the facility, formerly owned by Shield-Ware, for one month, it tendered Crown a royalty check for the cups produced on the Champion machines which were purchased with the plant, in accordance with Champion's contract with Crown. Crown refused the tender, stating that it considered Thompson obligated, under its assignment from Champion, to pay royalties on the production of all its plants, and on any Thompson machines placed in the New Jersey plant. When Thompson refused to pay royalties on any production other than that from the Champion machines, Crown filed this suit.

## ISSUES

The specific issues upon which the Court took evidence are as follows:

I. Is Crown entitled to an accounting for royalties on net sales of foam cups manufactured by Thompson on its "Champion" and "Thompson" machines under the provisions of the license agreement?

(a) Is Thompson a licensee of Crown with regard to its manufacture and use of Thompson machines?

(b) Does claim 12 of the 260 Patent cover defendant's Thompson machines?

(c) Do claims 1 and 3 of the 780 Patent, or either of them, cover defendant's Thompson machines?

(d) Does the claim of the 705 Patent cover the method used in operation of defendant's Thompson machines?

(e) Is Crown entitled to enforce the license agreement against Thompson?

II. Has Crown violated the antitrust laws of the United States, specifically 15 U.S.C. §§ 1 and 2, in its obtaining of and its use of the licensed patents?

(a) By its licensing of any or all of the patents upon which it seeks to recover royalties in the complaint; or

(b) By its prosecution in the U. S. Patent Office of any of the applications which matured into the 260, 780 and 705 Patents; or

(c) By bringing action in several Federal Courts for the enforcement of any of the above patents?

III. Is Thompson entitled to a declaratory judgment that none of the claims of the 260, 780 and 705 Patents cover the Thompson machines and that no royalties are due and payable to Crown on account of production of foam cups on such machines or on account of the manufacture and use of Thompson machines?

 Crown argues that by becoming its licensee after being charged with infringement, Thompson intended to submit its own machines to the Crown license. I disagree. Crown, in July of 1962, did charge Thompson, and others, with infringement, but Thompson denied infringement then, and has not changed its position. At no time did Thompson desire or request a license to manufacture or operate its own machines.

By February of 1963, Champion had lost nearly $1,500,000.00 on its foamed cup venture, and the company was anxious to terminate that line. Champion realized, however, that it could not effectuate a sale of its plant and machinery if the buyer would not receive a license to operate the equipment and, as a result, its contract with Crown was revised August 2, 1963, to provide that the right to operate the molding machines would transfer along with the sale of substantially all its related assets. At this time, Champion had no rights or obligations on any cup molding machines other than its Champion machines. Accordingly, when Thompson agreed to pay royalties *"in the place of Champion"* it only assumed an obligation with regard to the 15 Champion machines.

Clearly, Thompson intended to become a licensee only as to the Champion machines. Prior to the purchase of assets, it vigorously denied all claims of infringement and, rather than seeking a

license, almost dared Crown to bring suit. The evidence is clear that this position was not changed at the time of the purchase of Champion's plant, and that Thompson intended to become a licensee only insofar as the 15 Champion machines it purchased.

To conclude that Thompson and Champion did not intend that Thompson become a Crown licensee, except for the limited purpose of operating the 15 Champion machines, does not, in itself, mean that no royalties are due Crown for the cups produced by the Thompson machines. Section 6(a) of the revised licensing agreement[2] executed by Crown and Champion on August 2, 1963, is pertinent and controlling on this issue. So even though Thompson did not intend to become a Crown licensee with regard to the use of Thompson machines, by assuming the obligations of this agreement "in the place of Champion" it would still be liable to Crown for royalties on its machines, *if* those machines are covered by any of the claims of Crown's patents. Consequently, we must scrutinze the claims and their relationship to the Thompson machines.

 Two principles must be applied to the scope, utility and operating effect of the Crown patents. One holds that the patents in question are to be construed in light of the prior art. Prior to trial, I held that since Crown's claim was one for the recovery of royalties under a specific license, Thompson would be precluded by cases such as Sbicca-Del Mac, Inc. v. Milius Shoe Co., 145 F.2d 389 (8th Cir. 1944) from raising an issue of patent invalidity by way of defense. Although Thompson may not contest the validity of the patents, it can contend that the prior art in this field requires that Crown's patent claims be given a con-

---

2. "CHAMPION shall have no obligation hereunder to report net sales or to pay royalties to CROWN except as to cups and containers made and sold by CHAMPION or its subsidiaries which are covered by a claim of any issued patent in said 'CROWN patent rights' or which are made by CHAMPION on any machine or by any method covered by a claim of any issued patent in said 'CROWN patent rights' and 'CHAMPION patent rights', which claim or claims have not been held invalid by any Court of competent jurisdiction by a judgment which has become final."

struction which would eliminate the Thompson machines from their coverage.

The license itself states that it is to be construed under Texas law. The only case from that jurisdiction near this point is Penn v. Garabed Gulbenkian, 243 S.W.2d 220 (Tex.Civ.App.1951). There the Court, without addressing itself to the question of prior art, held that the worthlessness of a patent could be a defense to a claim for royalties. In my view, the better reasoned cases in other jurisdictions, hold that a defendant such as Thompson can look to prior art to prove non-coverage.

In Casco Products Corp. v. Sinko Tool & Mfg. Co., 116 F.2d 119 (7th Cir. 1940), cert. denied 312 U.S. 693, 61 S.Ct. 713, 85 L.Ed. 1129 (1941), the Seventh Circuit held that while the defendant in a suit for specific performance of a license contract could not rely on prior art to invalidate a patent, it could prove that its own product was within the prior art and thus not an infringement of the licensed patent. In Garland v. Remington Arms Co., 137 F.Supp. 622 (S.D.N.Y. 1956), the defendant in an action to recover royalties under a license agreement was allowed to resort to prior art to establish non-coverage. The Court concluded that "* * * prior art may be used, by a licensee, for the purpose of construing the claims of a patent, even though such evidence may reduce the patent to naught." (At p. 624.) Krantz v. Van Dette, 165 F.Supp. 776 (N.D. Ohio E.D.1958), aff'd per curiam 272 F.2d 709 (6th Cir. 1959); Baldwin Rubber Co. v. Paine & Williams Co., 107 F.2d 350 (6th Cir. 1939), cert. denied 309 U.S. 676, 60 S.Ct. 716, 84 L.Ed. 1021 (1950); Kessel v. Vidrio Products Corp., 113 F.2d 381 (7th Cir. 1940), cert. denied 311 U.S. 703, 61 S.Ct. 143, 85 L.Ed. 456 (1940) and Plastic Contact Lens Co. v. Butterfield, 366 F.2d 338 (9th Cir. 1966), support this view.

The other principle to be applied is that the patent claims are to be construed in the light of the specification's and that they are to be read to-gether in order to ascertain the scope of the invention. United States v. Adams, 383 U.S. 39 at 49, 86 S.Ct. 708, 15 L.Ed. 2d 572 (1966); Westinghouse v. Boyden Power Brake Co., 170 U.S. 537 at 568, 18 S.Ct. 707, 42 L.Ed. 1136 (1898); Grant v. Koppl, 99 F.2d 106 at 110 (9th Cir. 1938); Kemart Corp. v. Printing Arts Research Laboratories, Inc., 201 F.2d 624 at 629 (9th Cir. 1953); Morpul, Inc. v. Mayo Knitting Mill, Inc., 265 N.C. 257, 143 S.E.2d 707 (1965).

While I leave to my specific findings the precise detail of the prior art, here it should be mentioned that in 1955 and 1956, those engaged in plastic fabrication had molded a variety of articles from "prefoamed" or "preexpanded" polystyrene beads. These prefoamed beads were partially expanded before being charged into a molding cavity. Several of the early molders used a technique called "blow filling", to transport the extremely light weight prefoamed beads into the cavity. "Blow filling" included conveying prefoamed beads in a stream of air, introducing the combined bead and air stream into a molding cavity and exhausting the conveying air from the cavity, usually through a loosely clamped mold parting line. Strangely enough, the technique was quite similar to the early foundry practice of blowing sand into core molding cavities. It can be safely said that by September, 1957, "blow filling" of molding cavities with prefoamed beads in fast cycle production machines was a well known technique and had been described in many trade publications.

Illustrative of the prior art is the molding machine placed in commercial production about August 15, 1955, by William L. Parsons at the Bachman Machine & Tool Co., a molding machine placed in commercial production on January 9, 1956, by Robinson Industries, Inc., another molding machine placed in commercial use in May, 1956, by Donald Stevens and still another apparatus placed in commercial use on August 16, 1956, by Victor Bird at LaDella Plastics. All of these machines used some type of

a "blower" to inject the beads into the mold.

## CLAIM 12 OF PATENT 2,951,260

■ Plaintiff contends that this claim covers the defendant Thompson's machines. I disagree. My specific findings disclose that the Thompson machine does not use this patent's (1) peripheral outlet; or (2) its abutting surfaces; or (3) its cavity element open at both ends; or (4) its sources of air pressure differential. For other reasons stated in the specific findings, I find that this patent does not cover the Thompson machine.

## CLAIMS 1 AND 3 OF PATENT 3,125,780

■ Here, again, I must find against Crown's contentions. My specific findings demonstrate that the Thompson machine does not employ Crown's method of filling the molding cavity. The type of pressure applied to the inlet on the respective machines is readily distinguishable, as shown by my specific findings. Moreover, the method of heating used by Crown under claim number 3 is not used by the Thompson machine.

## SINGLE CLAIM OF PATENT 3,162,705

■ Clearly, the Thompson machine introduces air under pressure through a passage at the center of the cup cavity, while the specifications of the 705 Patent employs a vacuum to the circumference of the cup cavity. On this contention, we must keep in mind that the mere suggestion of a process not disclosed, is not a disclosure of a process. Consequently, Crown cannot use the suggestion of posi-

tive pressure to the inlet or gate opening to construe its claims. Craftint Mfg. Co. v. Baker, 94 F.2d 369 (9th Cir. 1938). The exact distinctions between this patent and the Thompson machine are enumerated with exactness in my findings.

■ In general, I would find that the Crown patents under scrutiny should not be construed to cover the Thompson machines. Consequently, no royalties are due Crown on cups manufactured under the Thompson machine.

## ANTITRUST COUNTERCLAIM

Thompson believes that Crown has used the patents in question, the licenses under them, and the suits based upon them, in such a way as to violate 15 U.S. C. § 2 [3] and asks relief under 15 U.S.C. §§ 15 [4] and 26.[5]

In support of its counterclaim, Thompson argues: (1) that Crown obtained the 705 and 780 Patents by fraud on the Patent Office, inasmuch as it had actual knowledge that the process defined in the 705 method had been publicly used by Thompson, more than one year prior to the time that it presented it to the Patent Office, and that it had actual knowledge that Claims 1 and 3 of the 780 Patent had been publicly sold and used more than one year prior to the time that it presented it to the Patent Office; (2) that Crown, without actual knowledge of the structures of competing concerns, attempted to coerce competitors into recognizing the validity of the 260 Patent; (3) that Crown attempted to coerce acceptance of licenses under the patents in question here by the use of threatening letters charging infringement, and by the use of unwarranted

3. 15 U.S.C. § 2.
"Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, * * *."

4. 15 U.S.C. § 15.
"Any person who shall be injured in his business or property by reason of any-

thing forbidden in the antitrust laws * * * shall recover three fold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

5. 15 U.S.C. § 26.
"Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, * * * against threatened loss or damage by a violation of the antitrust laws * * *."

patent infringement actions; (4) that Crown did not bring the infringement actions for its sole benefit, but for the benefit of it and its licensees; (5) that Crown, knowing that one or more of its patent claims were invalid, entered into multiple patent licenses with concerns throughout the United States, whereby those concerns were enjoined from contesting the validity of the licensed patents; (6) that Crown based its royalty on the production of foamed cups, although it had no patent on such cups but merely on the machines which produced them; and (7) that Crown utilized a massive program of citing its patents and patent applications to the industry and demanding inspection of competitive developments of others, in order to be able to hand tailor its pending patent application so as to seem to cover the intervening and independent developments of its competitors.

█ While it is a general rule that a licensee cannot attack the validity of patents under which he is licensed, Sola Elec. Co. v. Jefferson Elec. Co., 317 U.S. 173, 63 S.Ct. 172, 87 L.Ed. 165 (1942); MacGregor v. Westinghouse Elec. & Mfg. Co., 329 U.S. 402, 67 S.Ct. 421, 91 L.Ed. 380 (1947); Bowers Mfg. Co., Inc. v. All-Steel Equipment, Inc., 275 F.2d 809 (9th Cir. 1960), I believe a licensee can challenge the validity of the patent where the owner is using the patent to unreasonably restrain competition in interstate commerce. Nachman Spring-Filled Corp. v. Kay Mfg. Co., 139 F.2d 781 (2d Cir. 1943); Automatic Radio Mfg. Co. v. Hazeltine Research, 339 U.S. 827, 836, 70 S.Ct. 894, 94 L.Ed. 1312 (1950).

At the outset, a trier of the facts on charges such as these, must recognize the delicate balance between the antitrust laws condemnation of unlawful attempts to monopolize, and the constitutionally guaranteed privilege of a patentee to enjoy a limited monopoly for a limited time.

Obviously, there is nothing inherently evil, nor unlawful, for a patentee to crown himself with the rewards of his invention by securing a royalty on the machine's output. To one with limited capital, this is probably the most logical and sensible approach. In any event, there is nothing unlawful or illegal about such conduct. The several patent infringement actions prosecuted by Crown are viewed with terror by Thompson. In a recent case, in which the record presented far more sinister conduct and actions by the patent owner, I was soundly criticized for condemning the owner. The case was reversed. Plastic Contact Lens Co. v. Butterfield, supra.

█ I must start with the premise that patents are *prima facie* valid.[6] If the patentee believes the patent is valid, he normally cannot be charged with bad faith or knowledge of invalidity. Kemart Corp. v. Printing Arts Research Laboratories, Inc., supra. The actions against Magi-Cup, Henolite, Sutherland, T. I. Plastics and Apollo were instituted after, what appears to be, a reasonable investigation into the details of the equipment used by the respective concerns. Clearly, a patentee is privileged to inquire of another as to the details of equipment used, in order to determine whether there is an infringement in fact. American Needle and Novelty Co. v. Schuessler Knitting Mills, Inc., 258 F. Supp. 98 (N.D.Ill.E.D.1966). Furthermore, there is nothing illegal about a provision in a license agreement whereby the licensee agrees not to contest the validity of the patent. United States v. Harvey Steel Co., 196 U.S. 310, 25 S.Ct. 240, 49 L.Ed. 492 (1905). I find that Thompson has failed to carry its burden in establishing a lack of good faith on the part of Crown. For that matter, I feel that Crown, in good faith, felt that its patents were being infringed and that the controlling factor behind Crown's conduct was its own well being, rather than ill will or deplorable conduct. Even though none of its actions in the Courts were successful, that fact would not indicate that they were wholly groundless, coercive or unfair. Plastic Contact Lens Co. v. Butterfield, supra, 366 F.2d p. 345.

6. 35 U.S.C. § 282.

To be emphasized is the fact that both plaintiff and the defendant, by order of the Court, presented findings in support of their respective theories. These findings are supported by citations to the record and were extensively employed by me in deciding the respective issues. The parties will observe that I have heavily relied on the findings and conclusions proposed by the defendant on the issues with reference to the scope, utility and operating effect of the patents owned by Crown. Likewise, I have heavily relied on the findings proposed by the plaintiff in denying relief to defendant under the antitrust laws. The use of the meticulous language of an expert is almost indispensable in the formulation of a proper finding in a patent case, which involves technical and highly complex problems, such as here presented. In such a case, the aid of the language of a specialist is not only suggested, but is highly desirable. Vincent v. Suni-Citrus Products Co., 215 F.2d 305, 310–311 (5th Cir. 1954); Dreyfus & Cie v. Panama Canal Co., 298 F.2d 733 (5th Cir. 1962). Even in non-patent cases, the Ninth Circuit approves the practice of a trial judge looking to findings prepared by counsel. Molitor v. American President Lines, Ltd., 343 F.2d 217 (9th Cir. 1965); Glens Falls Ins. Co. v. Satree, 320 F.2d 92 (9th Cir. 1963).

My findings are in favor of the defendant and against the plaintiff on plaintiff's claim and in favor of the plaintiff and against the defendant on the defendant's antitrust claim.

A decree shall be entered dismissing plaintiff's claim and defendant's counterclaim. Thompson is entitled to a declaratory judgment that the manufacture, use or sale of its machines by it, or its assigns, does not constitute an infringement of Patents 2,951,260, 3,125,780 and 3,162,705, or any claim of these patents. The Court finds its unnecessary to pass on the validity of such patents or the claims thereof. My formal findings are filed concurrently with this opinion.