**CROWN MACHINE & TOOL CO., a corporation, Plaintiff,**

v.

**K V P-SUTHERLAND PAPER COMPANY, a corporation, Defendant.**

**No. 42224.**

United States District Court
N. D. California.

Sept. 26, 1967.

Supplemental Decision April 4, 1968.

Supplemental Order April 29, 1968.

James M. Naylor, San Francisco and Alfred H. Plyer, Jr. and Edward A. Haight, Chicago, for plaintiffs, Naylor & Neal; Parker, Carter & Markey; and Haight, Simmons & Hofeldt, of counsel.

Carl Hoppe and James F. Mitchell, San Francisco, for defendant; Eckhoff and Hoppe, San Francisco, of counsel.

## MEMORANDUM OF DECISION

SWEIGERT, District Judge.

This is a patent infringement action brought by plaintiff Crown Machine & Tool Co., (hereinafter "Crown") against defendant KVP-Sutherland Co., (hereinafter "Sutherland"). Defendant Sutherland has counterclaimed for violation of the antitrust laws. Jurisdiction of the patent action is founded upon 62 Stat. 931 (1948), 28 U.S.C. § 1338 (1964).

The case is presently before the Court after a trial of the issues and extensive post-trial briefing. The Court has also had the benefit of its extensive and fairly well detailed notes made during the trial of the case. The extent of the transcript, the exhibits, the briefs and these trial notes account for the length of the submission period.

Crown is the owner of U. S. Patent Nos. 2,951,260 (hereinafter '260), 3,125,780 (hereinafter '780) and 3,162,705 (hereinafter '705) relating to apparatus and method for making plastic containers from expandable polystyrene beads. The complaint charges that defendant Sutherland's use of so-called "Thompson Machines" to make cups from expandable polystyrene beads infringes its '260, '780 and '705 patents.

The claims in issue herein are the single claim of the '705 patent, claims 1

and 3 of the '780 patent, and claim 12 of the '260 patent.

The issues in the case are: (1) Is the sole claim of Crown's '705 patent valid in law?; (2) Are claims 1 and 3 of Crown's '780 patent valid in law?; (3) Is claim 12 of Crown's '260 patent valid in law?; (4) Are any of the foregoing claims infringed by the Thompson Machine?, and (5) Has Crown violated the antitrust laws of the United States in its obtaining of and/or its use of the '780, '705 and '260 patents?

In order to adequately deal with these issues it is first necessary that the background and history of the patents and polystyrene foam cup art be covered.

## I. BACKGROUND AND HISTORY OF THE PATENTS AND POLYSTYRENE FOAM CUP ART

Expandable polystyrene is a lightweight thermoplastic material impregnated with a "foaming" or "blowing" agent which is activated by heat. This material is marketed in the form of tiny beads (resembling sugar) and when heated the foaming or blowing agent causes the beads to expand uniformly in all directions to as much as thirty times their original size. Upon heating within a closed mold the beads expand and fuse together into a so-called "foam" in the shape of the mold. Such foams have the properties of toughness, high strength-to-weight ratio, low thermal conductivity and low water absorption. Hot drink cups, ice chests, buckets and Christmas decorations are just a few of the many items made of this material.

Badische Anilin & Soda-Fabrik AG, a German company, originated expandable polystyrene in the early nineteen fifties and is the owner of a number of United States patents on its process of manufacture and on the production of articles (foams) therefrom. (See Plt. Ex. No. 62). None of these patents, however, are the subject matter of this infringement suit.

On March 1, 1954, the Koppers Co., Inc., made the first public announcement in the United States of "expandable polystyrene". From that date until the spring of 1960 Koppers marketed an expandable polystyrene bead designated F–40 which had a relatively wide bead size distribution range, to wit: the beads varied in "average diameter from .5 to 3.0 millimeters." (Def. Ex. No. V–4.)

In the spring of 1960 Koppers came out with a special grade of high quality expandable polystyrene bead designated F–40–C which, unlike F–40, was of a standardized uniform bead size. Since then, F–40–C has been the type of bead material used by manufacturers of foam cups.

From 1954 until the early nineteen sixties, Mr. Edwin A. Edberg was in charge of Koppers' expandable polystyrene bead market development program. In that capacity Mr. Edberg gave many talks before trade associations and wrote a number of articles about expandable polystyrene beads—their properties, applications and methods of making the "foams" therefrom. In an article appearing in the March 1955 issue of *The Rubber and Plastics Age* Mr. Edberg wrote that these beads "may be expanded in heated molds into a variety of shapes and sizes in just one operation." Mr. Edberg gave three methods for heating and expanding the beads in the molds: "Direct introduction of dry steam into the mold cavity" or "steam heated molds" or "hot-air heated molds". The latter two methods were recommended where the thickness of the molded article was to be less than one inch. For "thin-vertical" sections it was recommended that the beads be partially expanded (using dry heat such as infrared bulbs or strip heaters) outside of the mold prior to their being introduced in the mold. (Def. Ex. No. V–5.)

In a paper presented at the Packaging Conference of the American Management Association at the Palmer House, Chicago, April 18–20, 1955, and later

printed in No. 46 of *Packaging Series*, Mr. Edberg stated:

"The molding operation consists of the following simple steps:

1. Charge a measured amount of expandable polystyrene to the mold to obtain the desired density.

2. Close the mold and apply heat (usually dry steam) until the beads are expanded.

3. Remove the source of heat and cool the mold.

4. Open the mold and remove foamed article." (Def. Ex. No. V–4).

Other articles by Edberg subsequently appeared in the January 1956 issue of Refrigerating Engineering (Def. Ex. No. V–3), the March 1957 issue of Refrigerating Engineering (Def. Ex. No. V–2) and the September 1957 issue of Modern Plastics Encyclopedia (Def. Ex. No. V–1)—all giving information on the means for molding "foams" from expandable polystyrene beads.

During the early days (1955–56) of expandable polystyrene beads a number of people were engaged in the commercial production of various "foam" articles. About October 1955 William L. Parsons commercially produced foam hi-fi speaker enclosures from a molding machine of the type shown in Def. Ex. No. F–H; in January 1956 Robinson Industries placed in commercial production a molding machine of the type shown in Def. Ex. No. G–H for making foam enclosures for air conditioning units; around May 1956 Donald Stevens molded for commercial use foam minnow buckets on a molding machine of the type shown in Def. Ex. No. H–H; and in August 1956 La Della Plastics placed in commercial use apparatus shown in Def. Ex. No. I–H for molding foam float rings.

The aforesaid four molding machines were all very simple slow-cycle, manually operated devices wherein a predetermined amount of beads were either dumped or blown (via an air stream) into a mold cavity through an inlet port, the port was then manually plugged and the mold heated. After cooling the mold was manually cracked and the foam article removed. The thickness of these various articles varied from $3/8''$ to 1 inch. The time to manufacture them ranged from 4 to 7 minutes.

In 1955 plaintiff Crown was in the business of making and selling plastic injection-molding machines and *solid* (as opposed to foam) plastic cups for the vending industry. These solid plastic cups had the disadvantage of high thermal conductivity, making them too hot to hold by the hand when containing a hot liquid.

In 1955 Crown undertook a development program to develop an automatic molding machine which would produce a thin-walled (in the order of .060 inches wall thickness) hot drink cup from expandable polystyrene beads.

Sometime during 1955 or 1956 Crown build its first foam cup machine. The evidence is in dispute as to the date of the first production of foam cups upon this machine. Based upon the development of this machine, James M. Harrison and Robert E. Smucker, employees of Crown and developers of this machine, filed U.S. Patent Office application serial No. 619,259 on October 30, 1956, for improvements in "Apparatus and Method for Making Plastic Containers". On May 1, 1958, the Patent Office Examiner required Crown to make what is termed a "division" between the method claims and the apparatus claims in the application and prosecute the application on one or the other type of claims. Crown elected to prosecute application serial No. 619,259 on the method claims and to file a new application containing the apparatus claims. On December 22, 1964, U.S. Patent No. 3,162,705 issued on this application with one claim for "Method of Making Plastic Containers". (See Plt. Ex. No. 15.)

On April 19, 1962, Harrison and Smucker filed application serial No. 191,662 with the Patent Office. This application contained, with modifica-

tions, the non-elected apparatus claims of the application serial No. 619,259 filed on October 30, 1956. On March 24, 1964, this application matured into U.S. Patent No. 3,125,780 containing four claims. (See Plt. Ex. No. 11.)

According to Crown, in order to successfully operate this first cup machine which it developed and upon which the '705 and '780 patents were based, it was necessary to screen the Koppers' F–40 polystyrene beads and remove beads larger than a certain size. This resulted in as much bead material being thrown away per cup as was used for making a cup. Accordingly, this machine was discarded and never used to commercially manufacture foam cups.

To solve the problem of the low grade material being supplied by Koppers during the fifties, Crown developed a second type of cup molding machine which solved this problem and went into commercial production on December 12, 1957. Based upon the development of this second machine, Harrison and Smucker filed on October 1, 1957, U.S. Patent Office application No. 687,394 for improvements in "Molding Mechanism and Heating Arrangement" which, on September 6, 1960, issued into U.S. Patent No. 2,951,260 containing thirteen claims. (See Plt. Ex. No. 7.)

Crown manufactured 300 of these '260 type machines and from December 12, 1957, until March 1960 all foam cups produced in the country were made on these machines by either Crown or its exclusive licensee Champion Papers, Inc., (hereinafter "Champion").

At approximately the time that Koppers introduced its high quality standardized expandable polystyrene bead F–40–C (March 1960) the first foam cups in competition with the Crown foam cups began to appear on the market. The first competitors were Bridges Plastic Products, Inc., of Los Angeles, California, and James A. Young of the San Francisco Bay Area. Bridges sold its first cups in March 1960 and Young in August 1960. Since then, numerous others, both licensed and unlicensed by Crown, have entered the foam cup manufacturing business.

Late in 1959 Darrow and Stanley Thompson of Thompson Industries, Inc., (hereinafter "Thompson") observed a Crown manufactured foam cup and decided that foam cups might be a product their company could make. Thompson then commenced to design a machine for manufacturing such cups and on November 10, 1960, Thompson produced its first commercial foam cups. Thereafter Thompson began the production and sale of its foam cup production machines (hereinafter referred to as the "Thompson Machine") and in January, 1963, Thompson sold several of them to defendant Sutherland. In August, 1963, Sutherland commenced the manufacture of foam cups on the Thompson Machines in Santa Clara, California.

On March 24, 1964, Crown commenced this suit against Sutherland. This is but one of many suits which Crown has commenced against purchasers and users of the Thompson Machines as well as against users of other types of machines (including Bridges and Young heretofore mentioned) and against Thompson Industries, Inc. Only this suit and the one against Thompson has been tried. On May 23, 1967, the United States District Court for the District of Arizona found that the '260, '780 and '705 Crown patents were not infringed by the Thompson Machines and that Crown had not violated the antitrust laws in its obtaining of and/or use of the foregoing patents. See Crown Machine & Tool Co. v. D & S Industries, Inc., 270 F.Supp. 271. Due to the particular nature of the Arizona suit against Thompson the Court there held, prior to trial, that defendant Thompson could not raise the issue of patent invalidity. Ibid. 270 F. Supp. at p. 279.

After the emergence of foam cup competition in 1960 the '260 type molding machine was, according to correspondence between Crown and its exclusive licensee Champion, not able to meet the

competition. (See Def. Ex. No. B–D). In September, 1961, Champion demanded and obtained a modification of its original license agreement which enabled it to buy molding machines from manufacturers other than Crown or to develop its own machines if Crown was unable to furnish machines of comparable or better efficiency than the competition's. (See Def. Ex. No. F–D). Champion then designed and constructed its own cup molding machine which it placed in commercial production in the fall of 1962. (Def. Ex. No. G–D). In 1963 Champion relinquished its exclusive license and since then, Crown has itself manufactured cups and has licensed others to manufacture foam cups on its patented machines.

Subsequent to 1963 Crown developed and manufactured a model P cup molding machine which Sutherland contends is a copy of the Thompson Machine. The '260 type machine is no longer being manufactured or used by Crown.

Finally, the growth of the foam cup industry is evidenced by the approximately one billion foam cups sold in 1963, the approximately 1.7 billion foam cups sold in 1964 and the September, 1963, formation of the Foam Cup Manufacturers Division of the Society of the Plastics Industries.

## II. THE 3,162,705 PATENT

The '705 patent (Plt. Ex. No. 15) relates to a method for making thin-walled containers from expandable plastic beads. The patent contains the following sole claim:

"A method of forming a cup shaped article having a relatively thin wall section from light weight, low density, finely divided beads of a foamable plastic material, such as polystyrene beads containing a foaming agent, such as butane or the like, including the steps of defining a cup shaped molding cavity with a thin wall section, supplying the relatively light weight, finely divided beads freely and on a demand fill basis to the bottom of the cup, applying an air pressure differential, through the full 360 degree circumferential extent of the cup cavity, and in a direction from the bottom of the cup to the top so that the beads will be accelerated into the cavity and will move into the most remote portions of the cup cavity from the point of initial supply, closing the point of initial supply of the cup cavity, and thereafter heating the beads in the cavity to their full foaming temperature to thereby cause the beads to individually unite, one with the other, and to glaze the outer surface of the thus formed article due to the internal pressure developed in the expanding beads."

Figures 1 and 2 of the '705 patent are shown in Appendices I and II, attached to this Memorandum.

The claim of the '705 patent first calls for the step of "defining a cup shaped molding cavity with a thin wall section". As shown in Appendix II and described in the specification, this cup shaped molding cavity 70 is defined by the core element 40 and the cavity element 38.

The claim next calls for "supplying the relatively light weight, finely divided beads freely and on a demand fill basis to the bottom of the cup." As provided in Appendices I and II, and disclosed in the specification, a hopper 22 containing the beads is connected through the central passage 28 and inlet opening 52 to the bottom of the cup cavity. The plunger 32 opens and closes the inlet opening 52. When the plunger 32 is in the raised position beads flow into the mold cavity 70. The specification provides no definition of the words "demand fill basis" or meaning thereof, although it does state that "during loading, prefoamed beads are supplied until the mold cavity is substantially filled." (Plt. Ex. No. 15, col. 5, 11. 35–37.)

The claim next calls for "applying an air pressure differential, through the full 360 degree circumferential extent of the cup cavity, and in a direction from the bottom of the cup to the top so that the beads will be accelerated into the cavity and will move into the most re-

mote portions of the cup cavity from the point of initial supply." The specification and drawings denote only one embodiment for accomplishing this: A vacumm 76 (Appendix I) is connected to the bead source 28 for sucking the beads into the mold cavity 70 via the connections 77 and 75, chamber Y (Appendix II), *porous* core element 40, mold cavity 70 and inlet opening 52. The specification suggests two other general means for loading the cavity but no structure is given in the drawings. The specification suggests applying a vacuum to the stripper ring 68 (Appendix II) or applying a positive pressure to the inlet opening 52 and blowing the beads into the mold cavity. Further, no definition or meaning of the words "through the full 360 degree circumferential extent of the cup cavity" is given in the specification.

The claim next calls for "closing the point of initial supply of the cup cavity". As shown in Appendices I and II and described in the specification, this is accomplished by the lowering of plunger 32 into the inlet opening 52.

The claim finally calls for "heating the beads in the cavity to their full foaming temperature to thereby cause the beads to individually unite, one with the other, and to glaze the outer surface of the thus formed article due to the internal pressure developed in the expanding beads." According to the specification and drawings this is accomplished by hot air or steam from source 74 (Appendix I) being drawn by vacuum 76 through connections 73 and 72 into chamber X (Appendix II), through the *porous* cavity element 38 into the mold cavity 70 (containing the beads), thence through the *porous* core element 40 into chamber Y and through connections 75 and 77 (Appendix I) to heat exchanger 86. The specification suggests another method of heating the beads but no corresponding structure is given in the drawings, to-wit: disposing a dielectric assembly around the cavity element 38 to instantaneously heat the beads in the mold cavity 70.

## B. *Prosecution History in the Patent Office*

Referring now to the file wrapper (Plt. Ex. No. 44) of the '705 patent it discloses that the initial application filed on October 30, 1956, contained 18 claims, of which ten were method claims and eight apparatus claims. The broadest method claim in this initial application was claim No. 1 and it claimed the process of forming an article from finely divided foamable plastic material by (1) prefoaming the raw beads by heating them, (2) pressing the prefoamed beads so that all of the prefoamed beads will be no larger than a predetermined size, (3) supplying a predetermined quantity of the pressed, prefoamed beads to a mold, (4) heating the beads and (5) removing the finished article from the mold. (Plt. Ex. No. 44, p. 12.)

In the first action by the Patent Office all the claims were rejected. The method claims were rejected as unpatentable because nine of the claims (Nos. 1–7, 9, 10) were met by the British patent in view of the Wiss, et al., patent and the O'Neill patent. The other method claim (No. 8) was rejected for being obvious in view of the cited references.

In response to the above action of the Patent Office, Harrison and Smucker filed an amendment on October 17, 1957, cancelling seven of the method claims (Nos. 2–5, 7, 9, 10), amending the other three (Nos. 1, 6, 8) and adding a new method claim (No. 19). All the amended method claims except No. 1, now contained the additional limitation of supplying a predetermined quantity of the pressed, prefoamed beads into the mold by "applying a vacuum". In the accompanying remarks applicants conceded that prefoaming was old but that "In none of the references of record do we find any mention of loading a thin walled, somewhat elongated type cavity by drawing prefoamed beads into the cavity with a vacuum. Nor do we find any mention of preliminarily sizing the prefoamed beads by rolling, pressing or otherwise, so they will not stick or jam

in the thin space in the cavity". (Plt. Ex. No. 44, p. 29.)

In this same response the following language in the specification was cancelled: "While we have stated that loading the cavity is done by vacuum, it might be more accurate to say that loading is done by the creation of a pressure differential. For example, we might apply a positive pressure to the inlet or gate opening and blow the prefoamed beads into the mold."

Accordingly, at this stage of the prosecution, applicants urged that the patentability of their invention rested on the features: (1) vacuum means of loading the beads into the mold cavity and (2) preliminary sizing of the prefoamed beads so that beads larger than a predetermined size are not used in the molding process.

In the second action taken by the Patent Office, dated May 1, 1958, the Examiner required applicants to make the heretofore mentioned "division" between the method claims and the apparatus claims so as to restrict the application to one or the other type of claims.

On September 8, 1958, applicants filed their election to prosecute the application on the method claims.

In the third action taken by the Patent Office, dated January 30, 1959, all claims were rejected as indefinite and application claims 1, 6 and 8 were rejected as unpatentable over the Koppers booklet in view of Glaxner, et al., and Jeffery patents. In this regard the Examiner stated:

"The Koppers booklet shows pre-expanding polystyrene beads, placing said pre-expanded beads in a mold cavity, and heating said bead filled cavity to expand and unite said beads into the desired final product. There appears to be no invention in compressing the pre-expanded beads to reduce their volume for insertion into a mold cavity with closely spaced walls in view of Glaxner et al who shows in column 1, lines 36–44, that compression may be used for reduction of the volume of pellets. In addition there appears to be no invention in using a vacuum to draw said beads into the mold cavity in view of Jeffery who shows on page 2, column 2, lines 46–75, the use of a vacuum for filling a mold with granular material." (Plt. Ex. No. 44, p. 36.)

In reply, applicants filed an amendment, dated July 28, 1959, wherein they cancelled all the foregoing claims (Nos. 1, 6, 8, 19) and in their place submitted two new claims (Nos. 27, 28). Neither of the two new claims mentioned any particular method of supplying the beads to the mold cavity (e. g., applying a vacuum). Applicants in their remarks emphasized the problem of preliminary sizing of the prefoamed beadings and that this problem "is totally foreign to the Koppers Booklet." (Plt. Ex. No. 44, p. 39.) No mention was made in the remarks of the previously mentioned problem of loading the cavity with a vacuum or the Examiner's previous citation of the Jeffery patent as teaching the use of a vacuum to fill a mold cavity to be old.

Thus, at this stage of the prosecution applicants relied entirely upon the preliminary sizing of the prefoamed beads as their exclusive patentable difference over the prior art.

In the fourth action by the Patent Office, dated February 15, 1960, the Examiner rejected the two new claims (Nos. 27, 28) "as unpatentable over the Koppers booklet in view of common practice shown by either Ratner or Gates, et al. To merely reduce the size of the prefoamed pellets in order that they may be enterable into the given mold cavity, if prefoaming resulted in the pellets being oversize, would not amount to invention in view of the secondary references since no new and unobvious results have been show (sic)." (Plt. Ex. No. 44, p. 40). The Examiner also informed applicants that final action on their application would be taken in the next Patent Office action.

In response thereto, Harrison and Smucker on July 20, 1960, requested the Examiner to reconsider his rejection of

claims 27 and 28 on the ground that "the Examiner has not found art showing or suggesting or otherwise anticipating the idea of preliminarily sizing prefoamed beads before they are supplied to a molding cavity having thin walls." (Plt. Ex. No. 44, p. 44.)

Thus, after four Patent Office actions and faced with a final action by the Examiner, applicants rested the patentability of their device exclusively on the step of preliminarily sizing the prefoamed beads.

However, six months later, but prior to any action by the Patent Office, Harrison and Smucker filed on January 3, 1961, a supplementary amendment cancelling claims 28 and 29 and adding two new claims in their stead (Nos. 29, 30). Both of these new claims lacked any mention of the recently emphasized step of sizing the prefoamed beads.[1] Rather, they emphasized the method of supplying the beads to the mold cavity, to-wit: "applying an air pressure differential to the cup cavity in a direction from the up bottom to the down upper lip of the cup cavity so that the beads will be accelerated down into the cup cavity and packed into the thin wall section" (No. 29) and "applying the air pressure differential to and through the full 360° circumferential extent of the down upper lip of the cup cavity to insure that the most remote portions of the cup cavity from the point of initial supply will be filled with beads." (No. 30.) (Plt. Ex. No. 44, pp. 45–46.) No amendment was made to the specification explaining the meaning of this new claim language quoted above.

In their accompanying remarks applicants argued that the patentability of their process now lay in the "idea of disposing a cup shaped cavity upsidedown, and then supplying finely divided, lightweight beads to the up bottom and insuring filling of the most remote portions of the cavity—meaning the down

upper lip—by the use of an air pressure differential." (Plt. Ex. No. 44, p. 47.)

In the fifth action by the Patent Office, dated February 3, 1961, the Examiner rejected claims 29 and 30 as unpatentable over the Koppers booklet in view of the Jeffery patent, stating: "Jeffery shows introducing a lightweight granular material into a mold cavity by a pressure differential. There appears to be no invention in introducing the preexpanded beads of the Koppers booklet into the mold cavity by using a pressure differential in view of Jeffery." (Plt. Ex. No. 44, p. 49.) The Examiner made the rejection final.

After a personal interview with the Examiner, applicants filed on April 12, 1961, an amendment cancelling claims 29 and 30 and submitting claim 31 which, in essence, combined the two claims. Applicants stated that this amendment was for the purpose of placing the application in better condition for appeal if allowance of the claim was not granted.

Claim 31 was rejected on April 18, 1961, by the Examiner but entered for purpose of taking an appeal. On August 4, 1961, applicants filed a notice of appeal.

On appeal, applicants again stressed the method used to load the molding cavity arguing that Jeffery does not teach the step of "applying an air pressure differential, through the full 360° circumferential extent of the cup cavity, and in a direction from the top of the cup to the bottom so that the beads will be accelerated into the cavity and will move into the most remote portions of the cup cavity from the point of initial supply." (Plt. Ex. No. 44, p. 64.)

On October 31, 1963, the Board of Appeals affirmed the decision of the Examiner stating, "The feature upon which patentability is predicated is the application of suction to draw the material into the mold cavity as specified in the claim"; that Jeffery discloses the appli-

---

[1]. In this regard it will be recalled that in March, 1960, Koppers introduced a special grade of high quality expandable polystyrene bead designated F-40-C which eliminated the necessity of having to size the prefoamed beads prior to introducing them to the mold cavity.

cation of a vacuum "through an annular passage which extends through the full 360° circumferential extent of his mold cavity" to draw material into the mold cavity; and "that the place of application of the vacuum would depend upon the shape of the cavity and would be obvious." (Plt. Ex. No. 44, p. 74.)

On November 21, 1963, applicants filed a Petition for Reconsideration, upon the ground that the Board misinterpreted the Jeffery patent in that Jeffery uses a quick vacuum to move a moist material while applicants use "air pressure differential to set up an airstream to a thin wall molding cavity with the airstream being the medium for moving light, foam, polystyrene beads into the furthest recesses of a thin wall cavity—something Jeffery clearly did not contemplate." (Plt. Ex. No. 44, p. 79.)

On August 4, 1964, the Board of Appeals reversed itself, stating:

"The petition presents a cogent argument as to the character of the material treated in the Jeffery patent. Taking into account the specific material treated by Jeffery, i. e., a relatively moist powdered material, and considering appellants' purpose and specific mode of utilization of vacuum (air pressure differential), 'through the full 360 degree circumferential extent of the cup cavity, and in a direction from the top of the cup [mold cavity] to the bottom * * *,' we believe that we should depart from our decision and reverse the rejection of the appealed claim." (Plt. Ex. No. 44, pp. 80–81.)

Thereafter, on August 21, 1964, certain amendments to the specifications and claim 31 were submitted to the Examiner by applicants and allowed as "editorial amendments" in accordance with Rule 312 of the Patent Office.

One so-called editorial amendment was the re-insertion of two sentences ("While we have stated that loading the cavity is done by vacuum, it might be more accurate to say that loading is done by the creation of a pressure differential. For example, we might apply a positive pressure to the inlet or gate opening and blow the prefoamed beads into the mold") in the specification which applicants had deleted from their original application in their first response of October 17, 1957.[2]

Claim 31 is now the sole claim of the '705 patent and its validity and infringement are two of the issues in this action.

C. *Prior Art*

Only two of the many prior art references cited by the Patent Office Examiner in the prosecution of the '705 patent need to be considered herein: Koppers Booklet, "Dylite-Expandable-Polystyrene" (1954) (Def. Ex. Nos. 1–18 and Jeffery U. S. Patent Re. 20,460 (1937) (Def. Ex. No. I).

The Koppers Booklet shows the process of making articles from lightweight low density, finely divided beads of a foamable plastic material containing a foaming agent by (1) supplying the relatively lightweight, finely divided beads freely to a mold cavity, (2) heating the beads to expand and fuse them together into a porous mass of the shape of the mold cavity, (3) cooling the mold and foamed article and (4) removing the artyrene" (1954 (Def. Ex. Nos. I–18 and p. 19.)

In Jeffery a vacuum is used to draw a uniform fine dust with approximately 10% moisture into a molding cavity. Jeffery states that one of the purposes of this vacuum is to evacuate the cavity so that "the powder is moved into the cavity quickly, uniformly and in a more dense condition than would result from merely pouring the powder into the container." (Def. Ex. I, p. 6, ll. 51–53.) Thereafter, the mold in Jeffery is closed and a higher vacuum is applied to "re-

---

2. It is to be noted that this identical amendment was filed with the United States Patent Office on January 16, 1963, in the prosecution of the application for the '780 patent—a year and a half prior to the above editorial amendment

move the air and gasses from the powder, so that the compressed blank will have the entrapped gas therein eliminated as far as possible."

In addition to the foregoing, defendant cites and places great emphasis upon the alleged prior uses of Parsons who manufactured foam hi-fi speaker enclosures, Robinson Industries which made foam enclosures for air conditioning units, Stevens who made foam minnow buckets and La Della Plastics which manufactured foam float rings. However, as heretofore mentioned these devices were slow-cycle, manually operated, molding machines whose molded articles were quite thick. In the opinion of the Court these prior public uses are not closely in point on the question of patent validity.

## D. *Patent Validity*

■ The 1952 Patent Act sets forth three conditions of patentability: Utility (35 U.S.C. § 101), Novelty (35 U.S.C. § 102) and Nonobviousness (35 U.S.C. § 103). We assume that the prior art does not disclose the process claimed in plaintiff's '705 patent and concern ourselves directly with the question of whether the '705 claim meets the test of nonobviousness, to-wit:

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made." 66 Stat. 798 (1952), 35 U.S.C. § 103 (1964).

In applying this test, the Court in the recent case of Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966) said:

"Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy."

Regarding the claims at issue the Court in *John Deere* admonished, at page 33, 86 S.Ct. at page 702, that:

"* * * an invention is construed not only in the light of the claims, but also with reference to the file wrapper or prosecution history in the Patent Office. * * * Claims as allowed must be read and interpreted with reference to rejected ones and to the state of the prior art; and claims that have been narrowed in order to obtain the issuance of a patent by distinguishing the prior art cannot be sustained to cover that which was previously by limitation eliminated from the patent."

Turning to the sole claim of the '705 patent we have seen from its file wrapper history that from the time the Examiner first cited the Jeffery patent in the Patent Office action of January 30, 1959, until January 3, 1961, Harrison and Smucker did not urge the step of loading the mold cavity by applying an air pressure differential, but, instead, relied entirely upon the step of preliminarily sizing the prefoamed beads as the exclusive patentable difference in their method or process over the prior art. Apparently, at this time, the applicants agreed with the Examiner that there was "no invention in using a vacuum to draw said beads into the mold cavity in view of Jeffery." (Plt. Ex. No. 44, p. 36). In addition, applicant's position at this time would be consistent with the commercial realities of the foam cup busi-

ness, wherein, according to Crown, their main problem in making commercial use of the machine first developed (disclosed in the '705 and '780 patents) was the sizing of the beads from low quality material being supplied by Koppers. After Koppers introduced its high quality F–40–C bead, there was no sizing problem, and everybody then got into the foam cup business.

Thus, it is crystal clear that when Crown abandoned the foregoing line of argument on January 3, 1961, and thereafter concentrated on the step of supplying beads by an air pressure differential, it was a result of Koppers' introduction of the F–40–C bead which eliminated the problem of sizing.

Turning to the step upon which the Board of Appeals allowed the claim, we have seen from the file wrapper history that initially the Board affirmed the decision of the Examiner finding that "the application of suction to draw the material into the mold cavity" was taught by Jeffery and that the "place of application of the vacuum would depend upon the shape of the cavity and would be obvious." (Plt. Ex. No. 44, p. 74).

The Board reversed itself based upon the specific material treated by Jeffery (a relatively moist powdered material) vis-a-vis plaintiff's dry, lightweight particles and the purpose and specific mode of utilization of vacuum (air pressure differential) by plaintiff. This Court is at a loss to explain the Board's allowance on the basis of the above distinction.[3] Whether a vacuum is used to move a fine dust with approximately 10% moisture into a mold cavity or used to move dry lightweight particles into a mold cavity is a distinction without a difference.[4]

Vacuums are used for moving many different types of materials and a mere change of usage is not the sort of non-obvious difference upon which a patent may be obtained.

The Board, however, also reversed itself upon the specific mode of utilization of vacuum by Harrison and Smucker's '705 claim vis-a-vis Jeffery. Previously the Board had held in affirming the Examiner that the application of the vacuum "would depend upon the shape of the cavity and would be obvious."

The language of the claim on this point, "applying an air pressure differential, *through the full 360° circumferential extent of the cup cavity*, and in a direction from the bottom of the cup to the top so that the beads will be accelerated into the cavity" was (as to the italicized portion) added for the first time on January 3, 1961, without any amendment to the specification in aid of explanation. What this language means in terms of a specific mode of utilization of air pressure differential to fill the mold cavity is unclear. The Board of Appeals in allowing this language did not specify what this unique mode of applying air pressure differential was, but merely quoted the language of the claim.

Plaintiff claims this language covers blowing the beads into the mold cavity or sucking them in by drawing a vacuum either through the stripper ring 68 (Appendix II) or through the porous walls and top of the core element 40. In effect, plaintiff seeks to use this unclear language to cover any and all means whereby an air pressure differential transfers the polystyrene beads to all portions of its cup shaped cavity. (See plaintiff's proposed finding No. 50). This plaintiff cannot do. Jeffery shows

3. In Graham v. John Deere Co., supra at 18, 86 S.Ct. at 694, the Court said "We have observed a notorious difference between the standards applied by the Patent Office and by the courts."

4. In this regard it appears that the beads are supplied with moisture when the mold cavity is heated by dielectric means. The specifications of the '260 patent suggest spraying or otherwise coating the beads with a jet of water prior to loading them into the mold when using dielectric heating. (Plt. Ex. No. 7, col. 7, ll. 23–26.)

loading a cavity by means of a vacuum to be old.

Nor can this claim be restricted to any particular embodiment disclosed in the specification of applying air pressure differential. The specific embodiment in the specification providing (without corresponding structure in the drawings) that the mold cavity be loaded by applying a positive pressure at the inlet to the mold cavity and blowing the beads therein is obvious in light of all the other steps of the process claimed (which are met by the Koppers booklet.)[5]

The embodiments of applying a vacuum through the stripper ring 68 or through the porous core element 40 are obvious means (in view of Jeffery) of vacuum loading plaintiff's particular mold cavity. The drawing of the vacuum through the stripper ·ring 68 would be obvious to one skilled in the art since it is the area furthest from the point of initial supply of beads (inlet opening 52) and, therefore, the most logical place for insuring that the mold cavity be completely filled. The pulling of the vacuum through the porous walls of the core element 40 would also be obvious to a person having ordinary skill in the art since the beads are supposed to completely surround said element and be molded thereon. Naturally, the application of vacuum to all portions of the core element would accomplish this.

The fact that all portions and recesses of plaintiff's thin-walled mold cavity can be successfully loaded by a vacuum (applied through either the stripper ring 68 or the core element 40 or by merely blowing the beads in at the inlet opening 52) clearly shows that there is no special problem associated with supplying plaintiff's thin-walled mold cavity with beads as they so strenuously urged during the *latter* period of the prosecution of their '705 application.

In support of patentability plaintiff Crown cites the failure of others to produce a thin-walled foam cup during the fifties, the commercial success of its foam cup and the fact that it and its exclusive licensee Champion were the sole commercial producers of foam cups from December 1957 until March 1960.

However, Crown's commercial success was not due to the foam cup machine disclosed in the '705 and '780 patents, but rather to the development of the '260 type machine which solved the problem, according to Crown, of the low grade polystyrene bead material being supplied by Koppers during the fifties. The foam cup machine disclosed in the '705 and '780 patents was discarded and never used commercially.

The fact that after Koppers solved its materials problem everyone jumped into the foam cup manufacturing business would tend to refute the patentability of the process claim of the '705 patent since the problem was one of sizing the beads prior to Koppers' introduction of the F–40–C beads, not of the application of any air pressure differential to load the mold cavity (which was the sole feature upon which patentability of the '705 claim was predicated and allowed by the Board of Appeals).

■■ Except for the step of applying an air pressure differential, the Koppers booklet (Def. Ex. No. I) teaches all the other steps of the '705 method claim. Plaintiff, however, claims that these other steps of its '705 claim are not met by the teachings of the Koppers booklet. (See plaintiff's Ex. No. 51– A). This plaintiff cannoᵗ now do. "[C]laims that have been narrowed in order to obtain the issuance of a patent by distinguishing the prior art cannot be sustained to cover that which was previously by limitation eliminated from the patent." Graham v. John Deere Co.,

---

5. It is to be noted that this positive pressure embodiment was never before the Board of Appeals but added subsequent to the appeal as an editorial amendment. Had this embodiment been before them it might have impressed them that there was nothing unique about loading plaintiff's mold cavity. Furthermore, had this embodiment been before the Examiner prior to the taking of the appeal, pertinent prior art might have been cited showing blow-filling to be old.

supra at 33, 86 S.Ct. at 702. And, as we have seen from the file wrapper history of the '705 patent the sole feature of patentability upon which the claim was allowed by the Board of Appeals was the application of the air pressure differential.

In view of the foregoing it is the conclusion of this Court that the sole claim of the '705 patent is invalid upon the ground that it fails to meet the test of nonobviousness as specified in 35 U.S.C. § 103.

## III. The 3,125,780 PATENT

### A. Description

The '780 patent (Plt. Ex. No. 11) relates to an apparatus for making foamed cups from a plastic material containing a foaming or blowing agent. While the patent contains four claims, only claims 1 and 3 are at issue in this action.

Claim 1 provides:

"In a molding mechanism for forming plastic articles, such as drinking cups and the like, from foamable plastic material, a base, a frame supported on the base, mold parts thereon defining a cup-shaped molding cavity including a cavity element and a core element, a source of supply on the frame adapted to supply foamable plastic material to the cavity, a supply passage between the source of supply and the cavity communicating with the cavity generally in the center of the small end of the cup as defined by the cavity, a valve for controlling the supply passage including a movable plunger generally aligned with the axis of the cavity and having a diameter less than the diameter of the bottom of the cup, the plunger being movable between a withdrawn position to allow foamable material to flow through the supply passage into the cavity and an extended position in which the plunger closes the supply passage and the face of the plunger completes the bottom of the cup as defined by the cavity, means for creating an air pressure differential through the cavity to convey the beads from the supply passage to the top edge of the cup as defined by the cavity, including means for applying a positive air pressure to the supply passage for blowing the prefoamed beads into the molding cavity, and means for heating the cavity to foam and unite the foamable material into a finished article."

Claim 3 provides:

"The structure of claim 1 further characterized in that the cavity and core elements that make up the molding cavity are impervious so that the air stream caused by the means for creating an air pressure differential flows through the cavity between and generally parallel to the opposed faces of the elements."

Figures 1 and 2 of the '780 patent are reproduced in Appendices III and IV, attached to this Memorandum. These drawings are almost identical with the drawings of the '705 patent except for two additions: the '705 patent drawings (Appendices I and II) do not contain the air pipe 94 seen in Appendices III and IV, nor the vacuum 88 connected to stripper ring 68 seen in Appendix IV.

Claim 1 of the '780 patent calls for a "base" and "a frame supported on the base." As described in the specification the base is denoted with the number 12 (Appendix III) and the frame with number 10.

Claim 1 next calls for "mold parts thereon defining a cup shaped molding cavity including a cavity element and a core element." As shown in Appendix IV and described in the specification the mold cavity 70 is defined by the cavity element 38 and the core element 40.

Claim 1 next calls for "a source of supply on the frame adapted to supply foamable plastic material to the cavity." As described in the specification this source of supply is hopper 22 (Appendix III).

Claim 1 also calls for "a supply passage between the source of supply and the cavity communicating with the cavity generally in the center of the small

end of the cup as defined by the cavity." As seen in Appendix IV and described by the specification, the supply passage 28 connects the source of supply 22 with the mold cavity 70 at a point (inlet opening 52) just above the center of the top surface of the core element 40 (i.e., center of the small end of the cup as defined by the cavity 70).

The claim next calls for "a valve for controlling the supply passage including a movable plunger generally aligned with the axis of the cavity and having a diameter less than the diameter of the bottom of the cup, the plunger being movable between a withdrawn position to allow foamable material to flow through the supply passage into the cavity and an extended position in which the plunger closes the supply passage and the face of the plunger completes the bottom of the cup as defined by the cavity." The specification describes this valve as plunger 32 which is raised and lowered by air cylinder 30. When plunger 32 is raised (the withdrawn position) prefoamed beads flow through inlet opening 52 into the cavity and after a predetermined time the supply passage 28 is closed by the lowering of the plunger 32 into inlet opening 52. It is noted in Appendix IV that in the lowered position the plunger 32 completes the top of the cavity element 38 (i.e., the bottom of the cup as defined by the cavity).

Claim 1 next calls for "means for creating an air pressure differential through the cavity to convey the beads from the supply passage to the top edge of the cup as defined by the cavity, including means for applying a positive air pressure to the supply passage for blowing the prefoamed beads into the molding cavity." The specification and drawings provide three different embodiments for creating an air pressure differential to convey the beads from the supply passage 28 to the mold cavity 70, to-wit: (1) A vacuum 76 (Appendix III) is connected to the bead source via the connection 77 and 75, chamber Y (Appendix IV), porous core element 40,

mold cavity 70, and inlet opening 52; (2) The cavity element 38 and core element 40 are impervious and the vacuum 88 (Appendix IV) is connected to the supply passage 28 via the passage 90, channel 92, porous stripper ring 68, mold cavity 70 and inlet opening 52; and (3) a positive air pressure blows the beads into the mold cavity 70 by means of the air pipe 94 which directs a jet of air at the inlet opening 52.

Finally, claim 1 calls for "means for heating the cavity to foam and unite the foamable material into a finished. article." The specification describes two embodiments for accomplishing the hearing: (1) Hot air or steam is drawn from source 74 (Appendix III) by vacuum 76 through connections 73 and 72 into chamber X (Appendix IV), thence through the porous cavity element 38 into the mold cavity 70, thence through the porous core element 38 into chamber Y and thence through connections 75 and 77 to heat exchanger 86 (Appendix III) and (2) disposing a dielectric assembly around the cavity element 38 to instantaneously heat the prefoamed beads in the mold cavity 70. No structure is given in the drawings for accomplishing this latter method of heating.

Claim 3 is dependent upon claim 1 and calls for the additional limitation, "that the cavity and core elements that make up the molding cavity are impervious so that the air stream caused by the means for creating an air pressure differential flows through the cavity between and generally parallel to the opposed faces of the elements." This claim merely limits the embodiments for creating an air pressure differential, heretofore discussed, so that the embodiment wherein a vacuum is applied to the *porous* core element is excluded.

B. *Prosecution History in the Patent Office*

As previously noted, this application serial No. 191,662, filed on April 19, 1962, is a division of application serial No. 619,259, filed on October 30, 1956. In reviewing the file wrapper history of

the '780 patent (Plt. Ex. No. 43) it will first be necessary to examine the file wrapper of the '705 patent (Plt. Ex. No. 44) from the time of filing until the Examiner required a "division" on May 1, 1958.

Referring again to the file wrapper of the '705 patent (Plt. Ex. No. 44) it appears that the initial application filed on October 30, 1956, contained not only ten method claims (heretofore discussed), but also eight apparatus claims (Nos. 11–18).

In the broadest apparatus claim filed (No. 11) and the one upon which all other apparatus claims were dependent there was provided as one element thereof "means for applying a pressure differential to the cavity to convey beads into the cavity from the hopper." (Plt. Ex. No. 44, p. 14).

In the first action by the Patent Office, dated May 3, 1957, apparatus claims 11, 12–14, 16, 17 were rejected as unpatentable over Wiss, et. al., in view of the O'Neill, Wiley, Gard and Mollers patents. (Plt. Ex. No. 44, pp. 19–20.)

In response thereto, Harrison and Smucker filed an amendment on October 17, 1957, wherein the heretofore mentioned element of the broadest apparatus claim (No. 11) was narrowed to read, "means for applying a *vacuum* to the cavity to convey beads into the cavity from the hopper." (Plt. Ex. No. 44, p. 26.) All but two of the other apparatus claims were cancelled and a new apparatus claim was added (No. 20). All apparatus claims now contained the limitation of loading the cavity by means of a "vacuum".

In this same response, applicants deleted from the specification the sole mention of loading the cavity by applying a positive pressure and blowing the prefoamed beads into the mold. In their accompanying remarks applicants stressed the problem of filling a thin-walled cavity with prefoamed beads and that they had solved this problem "by loading the cavity with vacuum." (Plt. No. 44, p. 28.)

Thus, at this stage of the prosecution, it is evident from the fact that all apparatus claims contained only the vacuum means of loading the mold cavity and, in addition, the deletion from the specification of the sole mention of using positive pressure to fill the mold cavity, that applicants either had not tried using a positive pressure to load their mold cavity or had been unsuccessful in using such a means to load their cavity.

In the next action by the Patent Office a division was required and, as previously mentioned, applicants elected to prosecute the serial No. 619,259 application upon the method claims.

It was not until three and one-half years later, on April 19, 1962, that Harrison and Smucker filed a new application (serial No. 191662) containing, with modifications, the non-elected apparatus claims. Referring to the file wapper of said application (Plt. Ex. No. 43) it is seen from the two apparatus claims submitted therein that one of the claims (No. 3) did not include the element of means for conveying beads into the cavity, and the other claim (No. 4) included as an element "means for applying an air pressure differential through the cavity to load the cavity with foamable material, the air being exhausted through the pores of the stripper ring so that the foamable material flows from the small end of the cavity toward the stripper ring at the large end." (Plt. Ex. No. 43, pp. 14–15.) The specification of the application mentioned vacuum as the only means of loading the beads into the mold cavity.

However, before any action was taken by the Patent Office, applicants filed a preliminary amendment on January 14, 1963, inserting the identical language in the specification that they had deleted from the '705 patent application on October 17, 1957, to wit: the application of a positive pressure to the inlet or gate opening and blowing the beads into the mold cavity. In addition, they submitted a new claim (No. 5) dependent on claim No. 3 and containing the addition-

al element of "means for creating an air pressure differential through the cavity to convey the beads from the supply passage to the top edge of the cup as defined by the cavity, including means for applying a positive air pressure to the supply passage for blowing the prefoamed beads into the mold." (Plt. Ex. No. 43, pp. 20–21.)

Thus, for the first time applicants specifically *claimed* a positive air pressure means for loading the mold cavity and inserted in the specification the positive air pressure language that had been deleted from the parent application over five years prior thereto. [6]

In the Patent Office action that followed on May 10, 1963, claim No. 3 was rejected as "unpatentable over Kelly who shows the basic structure claimed. See Figure 1. Remaining differences, if any, would appear to be but mere matters of design." (Plt. Ex. No. 43, p. 24.) Claims 4 and 5 were allowed. In addition, applicants were required to illustrate in their patent drawings every feature specified in their claims.

Allowed claim 4 differed from rejected claim No. 3 in only one significant respect: it had the additional element of loading the mold cavity with beads by means of an air pressure differential applied through the pores of the stripper ring. Allowed claim 5 was dependent upon rejected claim 3 and contained the additional element, heretofore quoted, of means for creating an air pressure differential and specifically including therein positive air pressure means.

Thus, the allowance of claims 4 and 5 over claim 3 indicates that the feature upon which patentability was found by the Examiner was the means of applying an air pressure differential to convey the beads from the source to the mold cavity. In this regard, however, the Examiner did not cite or make mention of the Jeffery patent, although that patent was cited in the '705 and '260 prosecutions as teaching the use of a vacuum to fill a mold cavity.

On June 10, 1963, applicants filed a response wherein they amended their drawings and specification to provide for the addition of an air pipe 94 and vacuum pump 88 connected to stripper ring 68 (Appendix IV).

On October 1, 1963, the Patent Office mailed applicants a "Notice of Allowance" granting them a patent with the aforesaid two claims.

On November 26, 1963, applicants filed a Rule 312 amendment requesting certain changes to the specifications and claims, and, in addition, submitting a new claim (No. 6), which changes and additions, applicants urged were merely "editorial" and did not require any additional search on the part of the Examiner. (Plt. Ex. No. 43, pp. 45–48.) The Patent Office by action dated December 16, 1963, refused to enter and allow these amendments.

After a personal interview with the Examiner, applicants submitted another amendment consisting of two new claims (Nos. 6, 7). These two new claims were allowed by the Patent Office without comment and the '708 patent thereafter issued with four claims.

### C. The Prior Art

The Kelly U. S. Patent (No. 2,773,284) and the Koppers booklet "dylite-expandable-polystyrene" (Def. Ex. No. H–3, H–8), both cited by the Patent

---

6. It is clear that this amendment and emphasis on filling the mold cavity by using a positive air pressure resulted directly from James Harrison's (President of plaintiff Crown) inspection of a Thompson Machine on January 3, 1963, (11 days prior to the filing of this amendment) and his report to Crown's patent attorney that the Thompson Machine used "positive pressure". See Harrison testimony (RT 1254). In response to this inspection and report Crown's patent attorney wrote Mr. Harrison on January 10, 1963 (4 days before the filing of the amendment), "I reviewed this case in view of the Thompson situation, at least as we know this machine, and I have added a new claim to emphasize this plunger and positive pressure in the inlet for loading the cavity." (Def.Ex.No. K–I.)

Office Examiner during the prosecution of the '780 patent and the Jeffery U. S. Patent Re. No. 20,460 (Def. Ex. No. G–1) are all that need be considered herein on the question of patent validity.

As pointed out by the Examiner, Kelly "shows the basic structure claimed" in plaintiff's rejected claim 3, to-wit: (1) a cup-shaped molding cavity 11 including a cavity element 12 and a core element 10, (2) a supply passage 16, 15, 18 and 19 between a source of supply (not shown in the drawings, but suggested in column 2, lines 46–48) and the cavity 11 communicating with the cavity generally in the center of the small end of the Kelly article as defined by the cavity 11, and (3) a valve for controlling the supply passage 19 including a movable plunger 24 generally aligned with the axis of the cavity and having a diameter less than the diameter of the small end of Kelly's article, the plunger 24 being movable between a withdrawn position to allow the plastic material to flow through the supply passage into the cavity and an extended position in which the plunger 24 closes the supply passage and the face of the plunger completes the bottom or small end of Kelly's article as defined by cavity 11.

The only important element lacking from Kelly and claimed in rejected claim 3 is the means for heating the mold cavity. Kelly has no means of heating the mold cavity since the plastic material introduced into its mold cavity is in a hot molton state.

The Koppers booklet suggests two means of heating the beads in a mold cavity: Direct introduction of steam into the mold cavity or indirect heating of the mold cavity. With respect to the former means of heating the mold cavity, the booklet suggests that "Drilled cavity molds permit the rapid molding of detailed parts using automatically controlled equipment." (Def. Ex. No. H–18, p. 19.)

The other reference, Jeffery, has been previously discussed in connection with the '705 patent.

D. *Patent Validity*

The same reasons for holding the sole method claim of the '705 patent invalid for lack of nonobviousness are applicable to claims 1 and 3 of the '780 patent.

The Kelly patent and the Koppers booklet teach all the elements of patent claim 1 except the application of an air pressure differential through the cavity to convey the beads from the supply passage to the mold cavity. Jeffery teaches the application of a vacuum (air pressure differential) to fill a cavity with a fine powder "quickly, uniformly and in a more dense condition."

This Court has previously determined in holding the '705 method claim invalid for lack of nonobviousness that the step of applying an air pressure differential to load a mold cavity is obvious in view of Jeffery and, in addition, that the specific embodiments of using a positive pressure to blow the beads into the mold cavity, and using a vacuum either at the porous core element 40 or at the stripper ring 68 to suck the beads into the cavity are also obvious. That reasoning is fully applicable to claim 1 of the '780 patent.

In the prosecution of the '780 patent application, the Examiner did not cite the Jeffery patent. In view of the fact that application claim 3, which the Examiner rejected, and application claims 4 and 5, which he allowed, differed in only the respect that the latter two claims contained the additional element of loading the mold cavity by means of an air pressure differential—the Jeffery patent would have been most relevant. Had the Examiner located the Jeffery patent he might have come to the same conclusion as the Examiner in the '705 prosecution, namely: "Jeffery shows introducing a lightweight granular material into a mold cavity by a pressure differential. There appears to be no invention in introducing the pre-expanded beads of the Koppers booklet into the mold cavity by using a pressure differential in view of Jeffery." (Plt. Ex. No. 44, p. 49.)

Furthermore, we have seen that plaintiff's claim of a positive air pressure in the amendment filed on January 14, 1963, was the direct result of Crown's President Harrison's inspection of a Thompson Machine and his report to his patent attorney that Thompson used "positive pressure". The plaintiff's resort to a claim of a positive air pressure to supply the beads to the mold cavity is reminiscent of Atlantic Works v. Brady, 107 U.S. 192, 2 S.Ct. 225, 27 L.Ed. 438 (1882) where the Court said that the practice of granting patent monopolies for every shadow of a shade of an idea "creates a class of speculative schemers who make it their business to watch the advancing wave of improvements, and gather its foam in the form of patented monopolies, which enable them to lay a heavy tax upon the industry of the country, without contributing anything to the real advancement of the art."

In light of Jeffery and the reasoning given in the discussion of the '705 patent, and that given herein, it is the conclusion of this Court that claim 1 of the '780 patent is invalid upon the ground that it does not meet the test of non-obviousness as enunciated in 35 U.S.C. § 103.

Patent claim 3 of the '780 patent is dependent upon claim 1 which has been held invalid. As we have seen, patent claim 3 was added as an editorial amendment and merely restricts claim 1 to an impervious core and cavity element, eliminating the air pressure differential applied through the porous core element 40. Inasmuch as the specific embodiment of applying an air pressure differential through the stripper ring, which this claim is directed toward, has been previously held to be obvious in view of the prior art this claim also must fall.

Accordingly, claim 3 of the '780 patent is declared invalid upon the ground that it fails to meet the test of nonobviousness, 35 U.S.C. § 103.

## IV. THE 2,951,260 PATENT

### A. *Description*

The '260 patent (Plt. Ex. No. 7), like the '780 patent relates to an apparatus for molding cup-like containers from plastic materials containing so-called "foaming" agents. While this patent contains 13 apparatus claims only claim 12 is at issue in this suit.

Claim 12 provides:

"In a molding machine for molding plastic articles from partially expanded foamable plastic beads, a base, a generally upright frame on the base, molding parts thereon defining a generally frusto-conical molding cavity, small end up, including at least a cavity element open at both ends and a core element insertable into one end of the cavity element, at least one such element being movably mounted relative to the other, abutting surfaces on the elements for engagement when the core element is fully inserted into the cavity element, a source on the frame for supplying partially expanded beads to the molding cavity, a valve between the bead source and the cavity for controlling the supply of such beads, power means for moving the one element and for operating the valve in times relation to the cyclical operation of the machine, a source of air pressure differential for conveying beads from the bead source into the molding cavity when the valve is open, such air source being in communication with the molding cavity, and a peripheral outlet in communication with the large bottom end of the cavity so that the source of pressure differential will create an air current through the cavity when the valve is open to convey beads from the bead source into the cavity."

Figures 1 and 2 of the '260 patent are set forth in Appendices V and VI, respectively, attached to this Memorandum.

Claim 12 first calls for a "base" and "a generally upright frame on the base."

The base is not shown in the appendices but base plate 12 (Appendix V), which is secured to the base, is shown along with the upright frame 10.

Claim 12 next calls for "molding parts thereon defining a generally frusto-conical molding cavity, small end up, including at least a cavity element open at both ends and a core element insertable into one end of the cavity element, at least one such element being movably mounted relative to the other." As described in the specification the cavity element is indicated generally at 18 and the core element is indicated generally at 20. The core element is carried in its entirety on piston rod 84 (Appendix V), which raises and lowers the core element for purposes of ejecting the finished molded cup, thereby making the core element "movably mounted relative" to the cavity element.

Claim 12 next calls for "abutting surfaces on the elements for engagement when the core element is fully inserted into the cavity element." As delineated in the specification the cavity and core elements abut at surfaces 146 (Appendix VI).

The claim next calls for a "source on the frame for supplying partially expanded beads to the molding cavity." As seen in Appendix V and disclosed in the specification the source of beads is hopper 156.

Next the claim calls for "a valve between the bead source and the cavity for controlling the supply of such beads." The specification and drawings described only one valve type arrangement: a slide valve 154 (Appendix VI) which moves at right angles to the axis of the cavity by means of piston rod 166. When transfer chamber 162 in the slide valve 154 is positioned below the hopper 156 beads fall down into it. When the chamber 162 is moved to the right by means of the piston rod 166 and positioned over the open top mold the beads are free to be drawn into the molding cavity.

Claim 12 next calls for "power means for moving the one element and for op-

erating the valve in timed relation to the cyclical operation of the machine." The power means for operating slide valve 154 is air cylinder 164 (Appendix V) which moves it by means of the piston rod 166. The power means for moving the core element is a lower power cylinder, which, according to the specification, is not shown, but which moves the core element by means of the piston rod 84. While the language in "timed relation to the cyclical operation of the machine" is not defined in the specification it apparently means that the operation of the slide valve 154 (which delivers the beads to the mold cavity) and the movement of the core element (for ejection of the finished cup) are done at certain predetermined times in the cyclical operation of the machine.

The claim finally calls for "a source of air pressure differential for conveying beads from the bead source into the molding cavity when the value is open, such air source being in communication with the molding cavity, and a peripheral outlet in communication with the large bottom end of the cavity so that the source of pressure differential will create an air current through the cavity when the valve is open to convey beads from the bead source into the cavity." The specification describes only one embodiment for accomplishing this. It specifies that a vacuum be communicated through the channels or holes 144 (Appendix VI) to the abutting surfaces 146; that the abutting surfaces 146 are slightly separated or "cracked" by means of the stand-off pins 80 (which pins project downwardly when activated by air pressure being supplied at chamber 74) causing the vacuum to be communicated to the cavity itself when the chamber 162 is full of beads and positioned over the open mold cavity. This separation of the abutting surfaces 146 creates a "peripheral outlet" in communication with the large bottom end of the cavity and permits the vacuum to suck the beads from the chamber 162 into the cavity. After a predetermined time the stand-off pins 80 are de-acti-

vated, and the surfaces 146 once again abut, thereby cutting off the vacuum from the mold cavity.

After the mold cavity is full of beads slide valve 154 returns to its position at the very left (wherein chamber 162 is below the hopper 156), the beads are then heated in the mold cavity and after cooling, the core element 20 is lowered and the finished cup is ejected.

### B. *Prosecution History in the Patent Office*

The file wrapper (Plt. Ex. No. 42) of the '260 patent application discloses that this application containing thirteen apparatus claims, was filed on October 1, 1957, (eleven months after the filing of the '705 patent application).

Application claim 19 (upon which patent claim 12 issued) was not presented in the initial application, but in a subsequent amendment.to the application.

In the first action by the Patent Office, dated February 3, 1958, three claims were allowed (Nos. 7–9) without citation of a reference against them. The remaining ten claims were rejected.

On June 18, 1958, and on October 23, 1958, applicants Harrison and Smucker filed amendments to the application. In the amendment of October 23, 1958, Crown introduced application claim 19 (which eventually matured into patent claim 12 now in issue).

Thereafter, on November 25, 1958, claim 19 was rejected by the Patent Office as indefinite, inaccurate and as "unpatentable over Laraway et al or Smucker et al in view of Jeffery. Both Laraway et al and Smucker et al show molds comprising a cavity element and a core insert each of which has fluid heating means. There appears to be no invention in adding a vacuum feed to the mold cavities of the primary references in view of Jeffery who shows such to be old in the art." (Plt. Ex. No. 42, p. 40).

According to the Patent Office, claim 19 was inaccurate because the peripheral outlet as claimed, appeared, contrary to the disclosure, to be a permanent opening in said mold cavity.

On April 13, 1959, applicants filed a response amending application claim 19 in a number of places including that dealing with the peripheral outlet.

On November 27, 1959, the Examiner rejected claim 19 again for being inaccurate because "the relation between the valve, power means to operate said valve, and the peripheral outlet is not clearly and concisely set forth in accordance with that disclosed in the specification." (Plt. Ex. No. 42, p. 47). The Examiner in this action, however, did not cite any prior art references against claim 19 as he had in the previous Patent Office Action. Thus at this stage of the prosecution, claim 19 was being rejected solely on grounds of inaccuracy.

On March 30, 1960, after a personal interview with the Examiner, applicants filed a response amending claim 19 and adding a new claim (No. 21), dependent upon claim 19.

Thereafter claim 19 was allowed along with claim 21. Claim 19 issued as patent claim 12—the sole claim of the '260 patent in issue in this action.

### C. *Prior Art*

Application claim 19 was originally rejected by the Examiner as "unpatentable over either Laraway et al or Smucker et al in view of Jeffery." (Plt. Ex. No. 42, p. 40). Of the various prior art references cited by defendant in this action these patents are, in the opinion of the Court, the closest in point.

The Laraway, et al, patent (Def. Ex. No. G–2) shows molding parts, including a cavity, open at the top, and a core element insertable into one end of the cavity with the core element being movably mounted relative to the cavity element. This reference also shows abutting surfaces on the elements for engagement when the core element is fully inserted into the cavity element, and power means for moving the core element.

The Smucker, et al, patent (Def. Ex. No. G–11) shows molding parts defining a generally frusto-conical molding cavity 41, including at least a cavity element 32

open at both ends (completely open at one end) and a core element 30 insertable into one end of the cavity element with the core element being movably mounted relative to the cavity element. In addition, Smucker shows abutting surfaces on the elements for engagement when the core element is fully inserted into the cavity element, a plunger type valve for controlling the supply of liquid plastic material and power means for moving the core element.

The Jeffery patent has been previously discussed herein.

## D. *Patent Validity*

In United States v. Adams, 383 U.S. 39, 48–49, 86 S.Ct. 708, 713, 15 L. Ed.2d 572 (1966), decided the same day as Graham v. John Deere Co., *supra*, the Court stated, "While the claims of a patent limit the invention, and specifications cannot be utilized to expand the patent monopoly * * * it is fundamental that claims are to be construed in the light of the specifications and both are to be read with a view to ascertaining the invention."

The specification of the '260 patent makes the following statement:

"One of the problems in rapid molding inexpensive thin-walled articles from foamable material is that it is difficult to fill the mold with the prefoamed beads and properly heat them. Many ways have been tried, but prior to this invention it has never been possible to successfully fill and heat the thin walls of the mold." (Plt. Ex. No. 7, col. 4, lines 64–69.)

Since this '260 application was filed eleven months after the filing of the '705 patent application, this statement from the '260 application confirms what Crown has previously admitted: that the machine disclosed in the '705 and '780 patents (built in 1955–1956) was not successful. The reason for this, according to Crown, was the poor quality of the polystyrene beads being supplied by Koppers. The '260 machine was subsequently built to solve this problem, did solve it, and became Crown's workhorse for a number of years.

In ascertaining the invention of the '260 type machine the question naturally arises as to what it was that made the '260 type machine successful and the machine disclosed in the '705 and '780 patents not successful. It could not have been the use of a vacuum (air pressure differential) to convey the beads into the mold cavity since both the '260 and '780 type machines both had a vacuum feed.

According to the testimony of one of the inventors and patentees, James Harrison, the nonuniform beads would not make the right angle bends in the '780 type machine, occurring at the inlet opening 52 (Appendix IV) and, where the top of the cavity meets the side cavity walls; that the beads would bridge up at these two locations and prevent further flow of bead material into the mold cavity; and that they therefore developed a second machine ('260 machine) having a completely open cavity element so that the beads would have "a straight shot down the side wall." (RT 1194–95.)

The '260 specification emphasizes this "completely open top" structure. (See Plt.Ex.No.7, col. 1, lines 66–67 and col. 6, lines 72–75).

Turning now to the previously discussed prior art, it is seen that the Smucker, et al, patent teaches, in essence, all the basic elements of claim 12 of the '260 patent except for an air pressure differential for conveying the plastic material into the mold cavity. The Laraway, et al, patent teaches all the elements of claim 12 except the air pressure differential, the valve and a cavity element open at both ends.

The Jeffery patent teaches the application of a vacuum (air pressure differential) to fill a mold cavity. This Court has previously found the specific embodiment of applying a vacuum at a peripheral gap (such as the stripper ring 68 in the '780 and '705 patents) to load a mold cavity with polystyrene beads to be obvious.

Accordingly, it would appear that claim 12 of the '260 patent should be declared invalid for the same reasons enunciated in connection with the claims of the '705 and '780 patents. However, claim 12 can be read in a manner such that its validity can be upheld.

Neither the Smucker, et al, patent nor the Laraway, et al, patent teaches a cavity element "completely" open at both ends. In Smucker, et al, the end from which the plastic material is introduced is not open, but solid, except for a pinhole through which the plastic material enters. In Laraway, et al, one end of the cavity element is completely solid.

Regarding this element of the claim, claim 12 provides "a cavity element open at both ends." Plaintiff Crown claims that this language does not mean a cavity element "completely" open at both ends, but any opening however small, such as the inlet opening 52 in the '780 patent.

The '260 patent specification speaks only of a "completely open top" (col. 1, ll.66–67) and, as we have seen, the heart of the '260 invention is a completely open cavity at the top so that, in the words of inventor Harrison, the beads would have "a straight shot down the side wall".

It is the opinion of the Court that if claim 12 is so restricted to a cavity element "completely" open at both ends, that the differences between the subject matter of the '260 patent and the prior art references of Smucker, et al, Laraway, et al, and Jeffery would not have been obvious at the time the '260 invention was made to a person having ordinary skill in the art. This conclusion is bolstered by certain secondary considerations as to which the Court in Graham v. John Deere Company, supra, 383 U.S. at 35–36, 86 S.Ct. at 703, stated:

"These legal inferences or subtests do focus attention on economic and motivational rather than technical issues and are, therefore, more susceptible of judicial treatment than are the highly technical facts often present in patent litigation. * * * Such inquiries may lend a helping hand to the judiciary which, as Mr. Justice Frankfurter observed, is most ill-fitted to discharge the technological duties cast upon it by patent legislation. * * * They may also serve to 'guard against slipping into use of hindsight' * * * and to resist the temptation to read into the prior art the teachings of the invention in issue."

The '260 type molding machine was the first commercially successful automatic machine for molding thin-walled articles from polystyrene beads. This machine served as the sole producer of foam cups for over two years. It was the only machine which manufactured foam cups during the entire time that polystyrene beads of a nonuniform and wide range diameter size were on the market. This machine was designed and did solve the materials problem by having a completely open top to the cavity element. The public's reception of the polystyrene foam cup was phenomenal. Furthermore, it is important to note that in spite of the public demand during the period that the nonuniform F–40 beads were on the market (1957–1960), no one else competed in the manufacture of foam cups with plaintiff Crown.

Accordingly, it is the opinion of this Court that claim 12 of the '260 patent, *as construed in this opinion,* meets the test of novelty and non-obviousness as provided in 35 U.S.C. §§ 102, 103 and therefore is valid.

## V. INFRINGEMENT

A. *Description of the Thompson Machine*

The alleged infringing device, the Thompson machine, (Appendix VII), is an automatic machine for molding thin-walled foam cups from polystyrene beads and has core and cavity elements 40 and 38, respectively, disposed so that the cup will be molded upside down. An inlet opening 50 in the cavity element 38 allows the beads to be supplied from tube 22 and passage 28 into the mold cavity

70. A plunger 32 opens and closes the inlet opening 50. When the plunger 32 is in the raised position, plastic beads can flow into the mold cavity.

The Thompson machine uses a means of positive pressure to convey the beads into the mold cavity. This is specifically accomplished by a source of high pressure air communicated to an inner passage of the plunger 32. When the plunger is raised, an air current issues from the end of the plunger at 52 and conveys the beads into the mold cavity 70. The air exits at a permanent peripheral gap shown by the letter A.

After the mold cavity of the Thompson machine is filled with beads, steam is admitted to heating chambers in the cavity and core elements, which heat the beads causing them to expand and fuse together into the foam cup. Cooling fluid is then circulated through the chambers to chill and solidify the molded cup. Then the cavity is opened by raising the cavity element and the molded cup is ejected from the core element.

### B. Infringement of '705 and '780 Patents

Having decided that the '705 patent and claims 1 and 3 of the '780 patent are invalid for lack of non-obviousness, it would be illogical, as hereinafter explained, for the Court to consider whether, assuming the claims valid, the above patents are infringed by the Thompson machine. Infringement would depend on how narrow the claims should be read in view of the specification and prosecution history. Defendant Sutherland argues that the specification and prosecution history of the '705 and '780 patents requires a narrow reading of the claims in issue so as to exclude several elements of the Thompson machine from the claims of the '705 and '780 patents. Plaintiff Crown, on the other hand, argues that if these claims are valid, they should be read broadly to encompass the aforesaid elements of the Thompson machine.

Having held the subject matter of the '705 patent, and claims 1 and 3 of the '780 patent to be obvious to one having ordinary skill in the art (in view of the cited prior art) any construction of these claims would have to be narrow. In fact, in the opinion of the Court, so narrow "as to be non-existent." On this point see the recent decision of the United States Court of Appeals for the Ninth Circuit in M.O.S. Corp. v. John I. Haas Company, 375 F.2d 614, 619 (9th Cir.1967). Accordingly, the Court will refrain from ruling on the question of whether the Thompson machine infringes the '705 patent and claims 1 and 3 of the '780 patent, assuming that they did meet the test of patentability.

### C. Infringement of '260 Patent

In upholding the validity of claim 12 of the '260 patent, this Court held that the claim must be restricted to "a cavity element completely open at both ends." This completely open top feature was the heart of the '260 invention in that the non-uniform beads would have a "straight shot down the side walls."

The Thompson machine does not have a completely open top cavity. As seen in Appendix VII, the only opening in the top of the cavity is the inlet opening 50 through which the beads pass. Thus the beads in the Thompson machine must, like the beads in the unsuccessful machines described in the '705 and '780 patents, make a right angle turn at the inlet opening 50 and where the top of the cavity meets the side walls of the cavity.

This element—completely open top to the cavity—is, as heretofore explained, the feature upon which patentability was found by the Court.

Accordingly, the lack of this element in the Thompson machine requires a finding that the Thompson machine does not come within the ambit of claim 12 of the '260 patent.

In addition to the foregoing distinction between the '260 machine and the Thompson machine, these two machines differ in a second substantial manner: The valve in the '260 machine is in the

form of a horizontally moving slide valve, whereas the Thompson machine has a vertically moving plunger. While claim 12 does not specify any particular type of valve for controlling the supply of beads, inherent in the '260 machine with its completely open top is a valve which will permit the beads to have "a straight shot down the side walls". The plunger type valve of the Thompson machine does not permit the beads to have a straight shot down the side walls. Accordingly, to infringe claim 12 of the '260 patent, there must be in addition to a completely open top, a valve which, like the '260 slide valve, permits the beads to either fall or be drawn directly down into the cavity which forms the cylindrical walls of the foam cup.

Accordingly, it is the conclusion of the Court that the Thompson machine does not infringe claim 12 of the '260 patent as construed herein.

## VI. ANTITRUST COUNTERCLAIM

The present case also involves a counterclaim by defendant Sutherland alleging that Crown has violated Section 2 of the Sherman Act, 15 U.S.C. § 2 (1964), in its obtaining and/or use of the '780, '705 and '260 patents.

Sutherland contends that Crown obtained its '705 and '780 patents by fraud on the United States Patent Office, and that Crown has used the patents to attempt to and to monopolize the business of manufacturing and selling foam cups in violation of Section 2 of the Sherman Act.

The evidence presented by Sutherland in support of its claim that Crown committed fraud on the Patent Office, boils down to certain amendments which Crown added to the specification and claims of the '705 and '780 patent applications while they were pending in the United States Patent Office. These amendments have been previously discussed in great detail. They pertain to Crown's inclusion in the specification and claims of the '705 and '780 patent applications of the air pressure differential and positive air pressure means for

loading the mold cavity. Sutherland contends that these amendments enlarged the scope of the aforesaid applications and appropriated improvements and inventions made by others, which had previously gone into the public domain.

This Court has previously found that Crown's amendment of January 14, 1963, to the '780 patent application wherein it *claimed* for the first time a positive air pressure means for loading the mold cavity—was the direct result of Crown's President Harrison's inspection of a Thompson machine, and his report to Crown's patent attorney that the Thompson machine used "positive pressure."

In the case of the '705 patent application, this Court has previously found that the amendment of January 3, 1961 —wherein Crown *claimed* for the first time the application of an air pressure differential to fill the mold cavity—was the result of Koppers' introduction of the F–40–C bead which eliminated the problem of preliminarily sizing the beads (the sole feature upon which Crown had most recently predicated patentability). This amendment of January 3, 1961, occurring prior to Harrison's inspection of the Thompson machine, did not include the specific claiming of "positive air pressure", as in the case of the January 14, 1963, amendment to the '780 patent application, nor did it include any amendment to the specification providing for the "positive air pressure" embodiment of air pressure differential. Rather, it was not until August 21, 1964, after the aforesaid inspection, and after the Board of Appeals had reversed the Examiner, that Crown amended the '705 patent application specification to include "positive pressure".

Crown contends that the amendments adding "positive pressure" to the '705 and '780 patent applications merely reintroduced what it discovered to be an inadvertent deletion from its '705 patent application as a result of its amendment

on October 17, 1957. (Plaintiff's Reply Brief, p. 20.)

That deletion from the specification of the '705 patent application [7] was part and parcel of Crown's amendments of the same date wherein it limited all its claims (save one) to "vacuum" loading, and argued that the patentability of its invention rested on vacuum means for loading the beads into the mold cavity. This could hardly have been inadvertent. Its reintroduction years later was not the result of any discovery that it had been inadvertently deleted, but rather, was the result of its discovery that its competitors had successfully used "positive pressure" to load the mold cavity.

 Accordingly, it is the finding of this Court that Crown intended to and did enlarge the scope of its '705 and '780 patent applications while they were pending before the United States Patent Office for the purpose of appropriating the "positive pressure" improvement for loading the mold cavity—an improvement developed by persons other than Crown.

 However, this Court is of the opinion that such conduct does not constitute fraud on the United States Patent Office within the meaning of the recent case of Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 86 S.Ct. 347, 15 L. Ed.2d 247 (1965). There, the United States Supreme Court held that the maintenance and enforcement of a patent obtained by fraud on the Patent Office may be the basis of an action under Section 2 of the Sherman Act. Concerning what constitutes fraud on the Patent Office, the Court stated at 177, 86 S.Ct. at 350:

"Walker's counterclaim alleged that Food Machinery obtained the patent by knowingly and wilfully misrepre-

senting facts to the Patent Office. Proof of this assertion would be sufficient to strip Food Machinery of its exemption from the antitrust laws. By the same token, Food Machinery's good faith would furnish a complete defense. This includes an honest mistake as to the effect of prior installation upon patentability—so-called 'technical fraud' ".

This Court does not consider Crown's conduct in enlarging the scope of its '705 and '780 patent applications to appropriate improvements made by others as coming within the type of fraud contemplated by the *Walker* case, to wit: "knowingly and wilfully misrepresenting facts to the Patent Office."

Nevertheless, Crown's conduct in expanding the scope of its '705 and '780 patent applications is to be considered in terms of whether or not Crown has monopolized or attempted to monopolize a part of trade or commerce under Section 2 of the Sherman Act. Sutherland has introduced evidence tending to show that whenever a foam cup competitor appeared on the scene, Crown demanded information from that competitor on the structure of its foam cup manufacturing equipment. (See Def. Ex. Nos. U–H–1, U–H–20, U–H–38, U–H–39, U–H–40, U–H–41, U–H–42, and U–H–43. The information then gained was in some cases used, as in the case of the inspection of the Thompson machine by Crown's President Harrison, to enlarge the scope of Crown's '705 and '780 patent applications.

After acquiring such information from its competitors, Crown then invariably informed said competitor that they were infringing Crown patents and/or Crown patent applications pending in the United States Patent Office. In charging infringement, Crown relied, in part, upon the '705 and '780 patents

---

7. This deletion was solely from the '705 patent application specification and consisted of the following language: "While we have stated that loading the cavity is done by vacuum it might be more ac- curate to say that loading is done by the creation of a pressure differential. For example, we might apply a positive pressure to the inlet or gate opening and blow the prefoamed beads into the mold."

568

and/or patent applications. In cases where competitors did not cease the alleged infringement, Crown instituted an infringement suit against them relying upon various Crown patents, including but not limited to its '705 and '780 patents. To date, Crown has filed at least seven different suits in various United States District Courts against alleged infringers.

Even though Crown has charged many persons with infringement, Sutherland has not introduced sufficient evidence to indicate that these claims by Crown were made in bad faith or were not well founded. In its claims of infringement against competitors, Crown relied, in part, upon patents and claims of patents that were not the subject matter of this suit. Sutherland has not presented evidence, as it could have, on the question of the validity of these other claims and whether or not there is any semblance of infringement of them by the various competitors Crown has charged with infringement.

Accordingly, except for this suit, this Court cannot determine whether Crown's conduct as to other competitors was or was not a good faith effort to enforce valid patent claims. Thus, this Court is not in a position to appraise the exclusionary power of the patent claims of the '705 and '780 patents as illegally expanded to include "positive pressure"—in terms of the relevant market—a necessary element for Sutherland to prove in order to show a violation of Section 2 of the Sherman Act. Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., supra. The other evidence introduced by Sutherland (Crown's license agreements and their terms, etc.) does not, in the opinion of this Court meet the proof of a Section 2 violation.

█ It is therefore the finding and conclusion of the Court that Sutherland has failed to establish that Crown violated Section 2 of the Sherman Act.

## VII. AWARD OF ATTORNEY FEES

█ In its prayer for relief, Sutherland has requested a judgment for costs and reasonable attorneys' fees under 35 U.S.C. § 285, which provides that the "Court in exceptional cases may award reasonable attorney fees to the prevailing party."

This Court believes that the instant suit falls within those cases deemed "exceptional" by Sec. 285, and that Sutherland should receive its attorney fees. In view of the conduct by Crown, heretofore discussed, equitable considerations make it grossly unfair that Sutherland be left to bear the burden of its own counsel fees. Day-Brite Lighting, Inc. v. Ruby Lighting Corp., 191 F.2d 521 (9th Cir.1951); Park-In Theatres v. Perkins, 190 F.2d 137 (9th Cir.1950).

While Crown alleged in the instant suit that its '260 patent was infringed by Sutherland, the real basis of Crown's suit herein was upon the '705 and '780 patents and particularly the "positive air pressure" or "blow" filling element of these patents. This Court has found that this element of "positive pressure" was appropriated by Crown from others and used to enlarge the scope of its '705 and '780 patent applications. Such activity has been condemned on numerous occasions. Railway Co. v. Sayles, 97 U. S. 554, 563, 24 L.Ed. 1053 (1878); Muncie Gear Works, Inc., v. Outboard, Marine & Mfg. Co., 315 U.S. 759, 768, 62 S.Ct. 865, 86 L.Ed. 1171 (1942).

Since the illegal enlargement by Crown of its '705 and '780 patent applications has been the keystone of this suit, Crown should pay Sutherland its attorney fees as contemplated by 35 U. S.C. § 285.

Accordingly, it is the order of this Court that defendant Sutherland should be and hereby is awarded its reasonable attorney fees. Counsel for Sutherland shall notice with the Clerk of this Court a hearing date for determining the amount of said fees.

This Memorandum of Decision shall constitute the Findings of Fact and Conclusions of Law as required by Rule 52 of the Federal Rules of Civil Procedure.

COPY OF PL. EXH.

Dec. 22, 1964 R. E. SMUCKER ETAL **3,162,705**

METHOD FOR MAKING PLASTIC CONTAINERS

Filed Oct. 30, 1956 2 Sheets—Sheet 1

*Fig. 1*

APPENDIX I

570

Fig. 2

APPENDIX II

COPY OF PL. EXH.

March 24, 1964 J. M. HARRISON ET AL 3,125,780

APPARATUS AND METHOD FOR MAKING PLASTIC CONTAINERS

Original Filed Oct. 30, 1956 2 Sheets—Sheet 1

Fig.1

APPENDIX III

*Fig. 2*

APPENDIX IV

COPY OF PL. EXH.

Sept. 6, 1960 J. M. HARRISON ET AL 2,951,260

MOLDING MECHANISM AND HEATING ARRANGEMENT

Filed Oct. 1, 1957 4 Sheets—Sheet 1

APPENDIX V

*Fig. 1*

COPY OF PL. EXH.

Sept. 6, 1960 J. M. HARRISON ET AL 2,951,260

MOLDING MECHANISM AND HEATING ARRANGEMENT

Filed Oct. 1, 1957 4 Sheets—Sheet 2

Fig. 2

APPENDIX VI

APPENDIX VII

### SUPPLEMENTAL DECISION

This is a patent infringement action, brought by plaintiff against the KVP–Sutherland Paper Company. The defendant Sutherland counterclaimed, charging plaintiff with violation of the anti-trust laws.

On September 26, 1967, this Court filed its Memorandum of Decision, containing the findings of fact and conclusions of law herein. The Court held:

(1) That two of plaintiff's patent claims (the '705 and '780) were invalid on the ground that they failed to meet the test of non-obviousness required by 35 U.S.C. § 103. (Memorandum of Decision, pp. 554, 555 and 560);

(2) That claim 12 of the '260 patent, while valid, was not infringed by the Thompson Machine. (Memorandum of Decision p. 564);

(3) That defendant Sutherland failed to establish that plaintiff violated the Sherman Act. (Memorandum of Decision, p. 568); and

(4) That defendant Sutherland should be awarded its reasonable attorney fees. (Memorandum of Decision, p. 568).

The case is presently before the Court on plaintiff's motion to amend finding No. (4) above.

The Court has held that the real basis of Crown's action was the '705 and '780 patents and particularly the "positive air pressure" or "blow" filling element thereof, and that this element of positive pressure was appropriated by Crown from others and used to enlarge the scope of the '705 and '780 patent applications. Noting that such activity has been condemned on numerous occasions, the Court stated (Memorandum of Decision, p. 568):

"Since the illegal enlargement by Crown of its '705 and '780 patent applications has been the keystone of this suit, Crown should pay Sutherland its attorney fees as contemplated by 35 U.S.C. § 285".

The cases cited in support of the Court's holding that the activity of enlarging the scope of one's patent with information obtained from others is improper, are Railway Co. v. Sayles, 97 U. S. 554, 563, 24 L.Ed. 1053 (1878); and Munice Gear Works, Inc. v. Outboard, Marine & Mfg. Co., 315 U.S. 759, 768, 62 S.Ct. 865, 86 L.Ed. 1171 (1942). These cases stand for the proposition that the law does not permit enlargement of original patent applications by amendment where the amendment adds new claims, not within the scope of the original application, which interfere with other inventions that have entered the field in the meantime. The Supreme Court, in the Railway case, 97 U.S. pp. 563–564, 24 L.Ed. 1053 stated:

"Courts should regard with jealousy and disfavor any attempts to enlarge the scope of an application once filed, or of a patent once granted, the effect of which would be to enable the patentee to appropriate other inventions made prior to such alteration."

Plaintiff contends that it had a duty to investigate potentially infringing machines before threatening or actually bringing infringement actions, and that, once information was gained from such inspection, it was proper to amend its existing claims to cover new matter so long as the amendments did not exceed the scope of the original patent disclosures.

To support this argument, Crown states that it had a duty and a right to investigate possible infringement of its '260 patent, which the Court held was valid. However, the amendments held to be improper in the pending case all relate to the '705 and '780 patents, which the Court has held invalid and which the Court has further found to be the "keystone of this suit."

Plaintiff next contends that, "assuming that Crown's conduct in obtaining the '705 and 708 (sic) patents went beyond the limits of propriety set by the Patent Office and the courts, Crown's conduct was still not sufficiently reprehensible to justify the award of attorney's fees to the defendant," citing Machtman v. Jones and Laughlin Steel

Corp., 134 F.Supp. 392 (D.C.Pa.1955); and Chicopee Manufacturing Corp. v. Kendall Co., 288 F.2d 719 (4th Cir. 1961).

However, in neither of these cases is there any indication that the prevailing parties requested attorneys' fees or that any were granted. Further, both of the cases involved such close questions of whether the patents in question were infringed that there could be little doubt that the suits were reasonably brought.

 The standard to be applied in determining whether attorney fees should be awarded to the prevailing party is whether there is a showing of unfairness or bad faith in the conduct of the losing party, or any other equitable consideration of similar force which makes it grossly unfair that the winner of the lawsuit be left to bear the burden of his own counsel fees. Thus, where there has been no such showing, the Ninth Circuit has reversed the District Court's grant of attorney fees. Day-Brite Lighting, Inc. v. Ruby Lighting Corp., 191 F.2d 521 (9th Cir.1951). Generally, where the claim of a patent application is not litigated in bad faith, an award of attorney's fees is error. Park-in-Theatres v. Perkins, 190 F.2d 137 (9th Cir. 1950).

The Court, considering the evidence heretofore discussed, finds that the action can be said to have been brought in bad faith; that it is an exceptional case within the meaning of 35 U.S.C. § 285; and, that reasonable attorney fees should be awarded to the prevailing party.

The motion to amend the Memorandum of Decision with respect to attorney fees is denied.

## SUPPLEMENTAL ORDER

Upon the Court's Memorandum of Decision dated September 26, 1967 and its further Memorandum of Decision dated April 4, 1968 and upon a hearing held on April 19th at which evidence was taken and argument heard on defendant's application for an award of attorneys'

fees as heretofore ordered, the Court finds:

(1) That defendant has incurred and paid to its counsel herein reasonable attorney fees in the amount of $82,530, (plus $20,253 in litigation expenses).

(2) That the portion thereof which should be ordered paid by plaintiff to defendant pursuant to the previous orders of this Court, considering all the circumstances as shown at the trial and at the hearing on attorneys' fees, should be limited to and is hereby fixed in the amount of $35,000.

It is so ordered and the judgment herein shall so provide.